Courtland L. Reichman (CA Bar No. 268873)
Laura Carwile (CA Bar No. 291906)
**REICHMAN JORGENSEN LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449
creichman@reichmanjorgensen.com

Sarah Jorgensen (*Pro Hac Vice*)
**REICHMAN JORGENSEN LLP**
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Facsimile: (650) 623-1449
sjorgensen@reichmanjorgensen.com

Gary J. Toman (*Pro Hac Vice*)
**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL LLP**
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433
gtoman@wwhgd.com

Kylie Chiseul Kim (*Pro Hac Vice*)
**KELLOGG, HANSEN, TODD, EVANS, FIGEL & FREDERICK LLP**
1615 M St. NW, #400
Washington, DC 20036
Telephone: (202) 326-7924
Facsimile: (202) 326-7999
kkim@kelloghansen.com

*Attorneys for Plaintiff*
*California Restaurant Association*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF BERKELEY, <br><br> Defendant. | Case No.  4:19-cv-7668-YGR <br><br> **CALIFORNIA RESTAURANT ASSOCIATION'S FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff California Restaurant Association ("CRA" or "Plaintiff") brings this Complaint for Declaratory and Injunctive Relief ("Complaint") against the City of Berkeley ("Berkeley" or "Defendant"), alleging as follows:

**INTRODUCTION**

1.     Berkeley banned natural gas infrastructure in newly constructed buildings beginning in 2020.  With millions of Californians sitting in the dark to avoid wildfires, and California's energy grid under historic strain, banning the use of natural gas in buildings is irresponsible and does little to advance climate goals.  The large-scale blackouts in 2019 bring into sharp focus the need for a workable approach to California's energy infrastructure and energy needs.  Banning natural gas altogether in new construction is not the solution, and is at odds with citizens' needs for reliable, resilient, and affordable energy, and taking such action locally conflicts with the federal and state energy regulatory structure.  Prohibiting natural gas cooking ranges, water heaters, fireplaces, space heaters, and backup generation is fundamentally inconsistent with the public interest, and is a violation of both federal and state law.

2.     In its rush to be the first all-electric city in California, Berkeley bypassed clear federal and state law.  Federal energy law was expressly intended to preempt conflicting state and local regulation and to impose a uniform, national energy conservation and use policy, including regulation of the energy use and energy efficiency of appliances.  State building laws and the state building standards and energy code likewise are designed to promote uniform standards regarding energy use in appliances and buildings, and must work within the confines of federal law.  Both federal and state law require a practical approach to energy regulation, maintaining neutrality and recognizing the need for a diverse energy supply.  This is for good reason: a patchwork approach is unworkable, undercuts national energy policy and California's need for reliable and resilient energy, increases the cost of housing in California, and denies consumers choice.  Taking away the ability to use natural gas cooking ranges, water heaters, heat, and fireplaces, as well as backup electric supply during power outages, is contrary to the state and federal legislative schemes.

3.     If a municipality chooses to enact more stringent energy use standards, it is required to

1

follow state and federal statutes and regulations governing such mandates.  The federal Energy Policy and Conservation Act ("EPCA") implements a national energy policy aimed at energy conservation that, among other things, regulates the energy use and energy efficiency of appliances.  The EPCA expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which the EPCA sets energy efficiency standards.  The default rule is federal preemption; Congress intended for national policy to control.  The EPCA leaves narrow room for concurrent state and local regulation, as long as the state or local regulations meet certain stringent statutory conditions.  While the EPCA regulates both consumer and commercial appliances, the regulation is focused on the appliance, not on the actual purchaser of an appliance; thus, commercial entities may purchase "consumer" appliances, and vice versa.  For both commercial and consumer appliances, however, the default rule is one of preemption, and state and local regulation is only permissible if it meets the stated criteria.  Notably, the thrust of the EPCA is that federal energy use and efficiency standards are sufficient for conservation goals and cannot be exceeded, and also that one type of energy should not be favored over another in the areas it regulates.

4.      The Berkeley Ordinance as a whole is preempted by the EPCA. There are no circumstances under which Berkeley's ordinance could be validly applied without violating EPCA; whether a permit application is granted or denied does not change the fact that the Ordinance's provisions violate the EPCA.  Likewise, the fact that Berkeley's Ordinance has a discretionary "public interest" exception to the natural gas ban does not save the ordinance from invalidity; its requirement that a permit applicant go through an exemption process is itself preempted.

5.      Similarly, state law has occupied the field of building standards, including the Building Standards Code and the Energy Code, and therefore preempts the Berkeley Ordinance. State law requires specific procedures to be followed if a city seeks to impose more stringent regulations on building standards and energy usage.  Berkeley bypassed these state procedures in its rush to mandate all-electric new buildings.  And in violation of state precedent, Defendant adopted the Berkeley Ordinance under Berkeley's general police powers. Because it failed to comply with State procedures, the Berkeley Ordinance is preempted by California law and is void and

2

unenforceable.

6.    These federal and state laws operate concurrently, creating a consistent and carefully calibrated regulatory system for local ordinances relating to energy use.  Federal law under the EPCA allows state and local regulations only when they are contained in a building code and meet specific statutory prerequisites, and state law then restricts cities' power to adopt local building codes that diverge from the state building and energy standards.  These complementary provisions ensure that any local ordinance affecting energy use is properly governed by both federal and state preemption policies.   Together, they leave only a narrow band of regulatory authority for local governments.

7.    Berkeley's Ordinance is premised on the conclusory assertion that use of electricity is better for the environment than use of alternative forms of energy, such as gas.  Such a policy decision should be based on reliable studies — the actual facts as opposed to assumptions.  Berkeley in substance assumes its conclusion about the environmental impacts of gas versus electric without credible scientific support.  This is part and parcel of why the federal and state regulatory frameworks impose specific requirements on the regulation of energy use — requirements that were completely ignored by Berkeley.  The CRA welcomes a legitimate public debate on environmental impacts, reliability and resilience of the energy grid, affordability, and other policy considerations.

8.    The CRA nevertheless is compelled to bring this action on behalf of its members because the Berkeley Ordinance's unlawful natural gas ban impacts its members.  Restaurants rely on natural gas for such things as food preparation and heating space and water, and even providing backup power during electrical outages.  Many of these restaurants rely on gas for cooking particular types of food, whether it be flame-seared meats, charred vegetables, or the use of intense heat from a flame under a wok. Indeed, restaurants specializing in international foods so prized in the Bay Area will be unable to prepare many of their specialties without natural gas.  Many chefs are trained using natural gas stoves, and losing natural gas will slow down the process of cooking, reduce a chef's control over the amount and intensity of heat, and affect the manner and flavor of food preparation. Restaurant owners and employees as well as restaurant customers will be denied the use of gas appliances to prepare food, to heat space, to heat water, or to use gas fireplaces in newly constructed

3

buildings.  And banning the use of natural gas also will impose greater costs on Berkeley businesses and consumers, in the midst of an affordable housing crisis.

9.     In short, Berkeley's natural gas ban will do little to advance environmental goals but will cause substantial adverse consequences for the CRA's members and the public.  While the CRA supports the State's climate goals, it must speak out against the harm to its members from this one-sided ban.

10.     Berkeley's effort to establish at a local level far-reaching energy policy and building standards conflicts with federal and state law, is contrary to the public interest, and imposes irreparable harm on the CRA and its members.  The CRA, on behalf of its members, thus brings this action seeking a declaration that the Berkeley Ordinance is void and unenforceable and to enjoin its enforcement.

## PARTIES

11.     Plaintiff California Restaurant Association ("CRA") is a nonprofit mutual benefit corporation organized under the laws of California with its principal office in the County of Sacramento, California.

12.     Defendant City of Berkeley is, and was at all relevant times, a municipal corporation existing under the laws of the State of California.

## STANDING AND RIPENESS

13.     As an association of members in the restaurant industry, the CRA has a substantial interest in having the laws relating to building standards executed and the duties at issue here enforced.

14.     The CRA has standing to bring this action because some of its members would have independent standing as they are denied constitutional and statutory rights, the interests that the CRA seeks to address by this action are germane to its fundamental purpose, and the claims asserted seek only declaratory and injunctive relief and therefore do not require participation of individual members.

15.     The CRA's members include both restaurant owners and chefs.  It has members that

4

do business in Berkeley, California, or who seek to do business in Berkeley, whose interests will be directly affected by this Ordinance.  The CRA has one or more members who are interested in opening a new restaurant or in relocating a restaurant to a new building in Berkeley after January 1, 2020, but who cannot do so because of the Ordinance's ban on natural gas.  One or more members would seek to open or relocate a restaurant in a new building in Berkeley but for the ban on natural gas.  The CRA's members will be irreparably harmed by the Berkeley Ordinance through the loss of the ability to use natural gas appliances in newly constructed buildings.

16.     There is no set of circumstances under which the Ordinance would be valid under state and federal law.

17.     An actual controversy has arisen and now exists between Plaintiff and Defendant concerning the validity of the Berkeley Ordinance. Plaintiff contends that the Berkeley Ordinance is an unlawful regulation of building standards using the City of Berkeley's general police powers and is preempted by California law.  Plaintiff also contends that the Berkeley Ordinance conflicts with and is preempted by the California Building Standards Code and the California Energy Code. Plaintiff further contends that the Berkeley Ordinance is preempted by federal law and does not satisfy the requirements of any exception to preemption. Plaintiff is informed and believes, and on that basis alleges, that Defendant disagrees with Plaintiff's contentions and asserts that the Berkeley Ordinance is lawful and enforceable.

18.     Enforcement of the Berkeley Ordinance will injure Plaintiff and is likely to be redressed by a favorable ruling from this Court.

## JURISDICTION AND VENUE

19.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the CRA asserts claims under federal law and under 28 U.S.C. § 2201(a) to the extent that it seeks declaratory relief and to enjoin state action as preempted by federal law.  To the extent that this Complaint asserts claims under California law, this court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) as such claims are part of the same case or controversy as the federal claims.

20.     Venue is proper under 28 U.S.C. § 1391 in this Court as Berkeley is located within

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                          4:19-cv-7668-YGR

this district within the County of Alameda and the acts and events giving rise to the claims occurred at least in part in this district.

## BACKGROUND

### The Berkeley Ordinance

21.     Berkeley originally considered adopting a formal "reach code" to ban gas appliances. A reach code would officially modify the default state building standards code.  Berkeley concluded that adopting an official reach code would require CEC approval, a process Berkeley found too "laborious," "cumbersome," and "complex."  Berkeley also feared the CEC might not grant the necessary approvals, so it "abandon[ed] the reach code strategy." *See* City of Berkeley Action Calendar (July 9, 2019).  Demonstrating its awareness that state policy did not permit it to ban natural gas appliances, in summer 2018, Berkeley complained to the CEC that its "policies as [sic] the state level are impeding our ability to encourage or require []electric technology when natural gas is available."  *See* Billi Romain on Behalf of City of Berkeley, "Berkeley Support to Phase Out Fossil Fuels with Clean Electrification," CEC Docket 18- IEPR-09 (June 28, 2018).

22.     Thus, unwilling or unable to obtain state approval, Berkeley pivoted to "a new approach" that would "avoid[] CEC regulations associated with asking permission to amend energy efficiency standards."  *See* City of Berkeley Action Calendar (July 9, 2019).  Under this new approach, Berkeley would adopt a city policy of refusing to grant permits for buildings that use natural gas.  Through this workaround, Berkeley hoped to ban natural gas appliances — as it had originally intended — while avoiding state and federal regulations.  As Berkeley acknowledged, "[t]he effect of this legislation will be that builders will be prohibited from applying for permits for land uses that include gas infrastructure[.]" *Id.*  "Instead of waiting for CEC" to agree to policies Berkeley wanted, Berkeley's "ordinance provides the City with an immediate pathway to fossil free new buildings[.]"  *Id.*

23.     Berkeley recognized that this policy was at odds with the existing state and federal regulatory approach.  As Councilwoman Harrison wrote in her memorandum recommending the ordinance, "[t]o date, the federal, state and local approach to energy use in new buildings has largely

been to mandate greater building efficiency and energy conservation, which indirectly results in lower emissions, but does not directly phase out fossil fuel consumption in new buildings." *Id.* But Berkeley was unsatisfied with the state and federal approach of allowing builders to choose how to achieve greater energy efficiency. It wanted an outright ban on natural gas.

24.    Berkeley's new approach ultimately took the form of Berkeley Ordinance No. 7,672-N.S. (the "Ordinance"), which the City Council passed on July 23, 2019. It was signed into law by the Berkeley Mayor, Jesse Arreguín, on August 6, 2019.

25.    The Berkeley Ordinance amends the Berkeley Municipal Code, adding a new Chapter 12.80 prohibiting natural gas infrastructure in new buildings effective January 1, 2020. The Ordinance prohibits "Natural Gas Infrastructure" in "Newly Constructed Buildings." Natural Gas Infrastructure is defined as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending from the point of delivery at the gas meter[.]"

26.    The Berkeley Ordinance was enacted as part of Berkeley's Municipal Code and provides that its requirements "shall apply to Use Permit or Zoning Certificate applications submitted on or after the effective date of this Chapter for all Newly Constructed Buildings proposed to be located in whole or in part within the City," and relies on Berkeley's general police power as the source of its authority. The supporting documentation in the administrative record asserts that Berkeley may rely on its general police power for the ordinance.

27.    The Berkeley Ordinance is part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety." The Berkeley Municipal Code contains a separate section, Title 19, regarding "Buildings and Construction" and containing Berkeley's building code and energy code.

28.    Berkeley's Ordinance has two purported "exemptions." The first allows gas where all-electric is "not physically feasible," Berkeley Ordinance § 12.80.040.A.1, which, on information and belief, merely represents a "phasing in" of the ban as the CEC models all-electric construction for additional building types — i.e., there is no "exemption" available for the types of buildings already covered by the ban. The second exemption gives the City discretion to allow the use of gas upon an

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                    4:19-cv-7668-YGR

application for an exception from the ban, if the City finds using gas to be in the "public interest" based on consideration of (a) other alternatives that are available (e.g., electric), and (b) issues of safety, health, and/or public welfare. Berkeley Ordinance § 12.80.050.A.

29.     The Berkeley Ordinance's standards concern the energy efficiency and energy use of appliances covered in the federal EPCA insofar as the Ordinance requires all appliances in newly constructed buildings to use only electric power and not natural gas.  In other words, by cutting off the gas pipeline, the Ordinance makes impossible and therefore effectively prohibits the use of gas appliances.

30.     The Berkeley Ordinance establishes building standards as defined by the California Building Standards Law, to wit, "any rule, regulation, order, or other requirement . . . that specifically regulates, requires, or forbids the method of use, properties, performance, or types of materials used in the construction . . . of a building." California Building Standards Law, Cal. Health & Safety Code § 18909(a).

31.     The Berkeley Ordinance does not identify any provision of the California Building Standards Code that it is amending or modifying for the City of Berkeley and in fact provides that it should not be construed as amending the California Energy Code.

32.     In particular, while the Berkeley Ordinance makes certain general findings on local conditions, the Ordinance does not identify the provisions of the California Building Standards Code and the California Energy Code that it is amending in the Ordinance. While, on information and belief, Berkeley submitted its Ordinance to the California Building Standards Commission after this suit was filed, Berkeley did not expressly identify the provisions of the Code that it was amending nor did it "file the amendments, additions or deletions expressly marked and identified as to the applicable [local] findings."

33.     On information and belief, Berkeley did not submit its Ordinance to the California Energy Commission ("CEC") for approval as an amendment to the California Energy Code, nor does it intend to do so.

34.     In fact, the Berkeley Ordinance conflicts with and effectively amends the California

8

Building Standards Code and the California Energy Code.

**The History Of Federal Regulation Of Appliance Energy Use**

35.     The federal government regulates the energy efficiency and energy use of appliances through the Energy Policy and Conservation Act ("EPCA").  42 U.S.C. § 6201 *et seq.*

36.     The EPCA was first passed in 1975.  It was designed to address the oil crisis the United States faced in the early 1970s.  While the federal government had little role in regulating energy use before the oil crisis, the EPCA was passed to create a "comprehensive energy policy" to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005).

37.     The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs."  S. Rep. No. 94-516, at 116-17 (1975).

38.     Since 1975, Congress has amended the EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards.  Each amendment to the EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

39.     In its original form in 1975, the EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency.  Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective."

9

*Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.  The Congressional record makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation."   H.R. Rep. No. 94-340, at 95 (1975).

40.     The EPCA permitted significant state involvement in appliance regulation.  It "allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard."  *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.

41.     In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy, to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, The National Energy Act of 1978, 10-SUM Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal Department of Energy in 1977, to coordinate a federal response to the nation's energy problems.

42.     One of these 1978 statutes passed as part of the NEA was the National Energy Conservation and Policy Act ("NECPA").  NECPA amended the 1975 EPCA.  Rather than relying exclusively on labeling, NECPA "required the DOE to prescribe minimum energy efficiency standards" for certain products.  *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.  NECPA also strengthened the preemption provisions in the EPCA, allowing state regulations "more stringent than federal regulations — or, if there was no federal regulation, a state could implement its own standard — *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce."  *Id.* (emphasis in original).

43.     In spite of these new requirements in NECPA, the Department of Energy did not adopt federal minimum energy standards.  Instead, it "initiated a general policy of granting petitions from

States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

44.     In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA").  The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

45.     As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that the bill was "designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements."  H.R. Rep. No. 100-11, at 24 (1987).

46.     Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards."  S. Rep. No. 100-6 at 2 (1987).  "In general, these national standards would preempt all State standards."  *Id.*

47.     While states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver could not be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators."  *Id.*   Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11.  To avoid preemption, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency."  *Id.* at 11.  The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding

11

Federal standards." *Id.*

48.     In 1992, Congress amended the EPCA once more through the Energy Policy Act of 1992.  That amendment "expanded the federal appliance program to include energy efficiency standards for commercial and industrial appliances" as well as consumer appliances.  *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500.

49.     Thus, in its present form, the EPCA covers both commercial/industrial and consumer appliances, and it sets federal standards for the energy use and efficiency of those products.  Rather than allowing joint regulation by states and the federal government, Congress has chosen to broadly preempt state regulation of appliance energy use and efficiency, with only narrow exceptions.

**The EPCA's Present Regulation Of Consumer And Industrial Appliances**

50.     The EPCA broadly preempts state regulations concerning the energy use of appliances, through express preemption provisions.  The statute then sets out specific requirements that must be met to be *excepted* from the general rule of preemption.  In other words, Congress meant to preempt the entire field of energy use by covered appliances, and replace it with detailed conditions that must be met for such state or local laws to avoid preemption.  This statutory structure manifests Congress's broad intent to preempt, with only narrow exceptions.

51.     Express preemption is a matter of statutory interpretation, focusing on the text of the provision and additionally taking into account the purpose of the statute if need be.

52.     The current version of the EPCA regulates both consumer and industrial appliances.  The express preemption in the EPCA's consumer regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

53.     "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ."  42 U.S.C. §  § 6291(4).  "Energy" is defined as "electricity, or fossil fuels."  *Id.* § 6291(3).

54.     The EPCA's energy efficiency and use regulations affect certain categories of "covered products."  The EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act.  42 U.S.C. § 6291(2).  Section 6292 in turn lists 19 types of defined covered products, including "water heaters," "furnaces," "dishwashers," and "kitchen ranges and ovens."  *Id.* § 6292(a).  Section 6295 sets out the energy conservation standards for these covered products.

55.     The EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" 42 U.S.C. § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.*  In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business.

56.     Thus, taking these definitions together, the EPCA's consumer standards preempt state and local regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters, furnaces, dishwashers, and stoves/ovens) which are regularly sold to individuals.

57.     Similarly, the EPCA also governs the energy efficiency and energy use of certain commercial and industrial appliances, in Subchapter 3, Part A-1. 42 U.S.C. § 6311-17.

58.     Like the EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute.  *Id.* § 6316(b)(2)(A).

59.     "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4).  The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

60.     The EPCA prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. 42 U.S.C. § 6311(2)(B).  Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent," and do not qualify as consumer products under that portion of the statute.  42 U.S.C. § 6311(2)(A).

61.     Thus, taking these definitions together, the EPCA's industrial standards preempt state and local regulations concerning the quantity of electricity or fossil fuels consumed by heating equipment, water heaters, and furnaces which are regularly sold for industrial or commercial use.

62.     The Ordinance falls within these general rules of preemption.  Natural gas is a fossil fuel.  The Ordinance concerns the quantity of natural gas consumed by appliances in the buildings it regulates, because, by barring the connection to gas pipes required to use natural gas, it requires that *no* natural gas is used.  This prohibition necessarily affects *all* appliances in the buildings regulated by the Ordinance, including appliances covered by the EPCA (such as consumer water heaters, furnaces, dishwashers, and stoves/ovens, and industrial heating equipment, water heaters, and furnaces), because under the Ordinance, *no* appliance can connect to a gas line and use natural gas.

63.     The CRA's members use appliances that qualify as "consumer products" and as "industrial / commercial products" under the EPCA.  Although the CRA's members are businesses, when they purchase or use consumer products — *i.e.,* a product distributed in commerce to individuals "to any significant extent" — those products are still consumer products.  Smaller restaurants may buy or use the same types of water heaters, furnaces, space heating, stoves, and ovens that are also sold to individuals.  The CRA's members also purchase or use appliances that qualify as "industrial equipment" under the EPCA.  Larger restaurants, especially those renting space in larger commercial buildings, may use large-scale furnaces and water heaters that are regularly sold for commercial or industrial (rather than consumer) use.

**Berkeley Does Not Meet The Conditions For Exemption From Preemption for Consumer Appliances**

64.     The EPCA contains only limited exceptions to the general rule of preemption for

14

consumer appliances.  In particular, a state or local regulation is not preempted if it "is in a building code for new construction" and meets seven specific requirements.  42 U.S.C. §§ 6297(c)(3), (f)(3).  The regulation must meet *all seven* of these requirements to avoid preemption.  The seven requirements, taken together, are intended to allow only performance-based codes that give builders choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another.  *See* S. Rep. 100-6, at 10-11 (1987).

65.    As an initial matter, the Ordinance is not eligible for exemption from preemption under Section 6297(f)(3) because it is not in a building code for new construction.  The Ordinance is instead part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety."  The Berkeley Municipal Code contains a separate section, Title 19, regarding "Buildings and Construction" and containing Berkeley's building code and energy code.  The Ordinance is not part of that building code.

66.    The Ordinance also does not meet all seven requirements listed in Section 6297(f)(3), and it must meet *all seven* in order to avoid preemption.  In particular, the first requirement is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective."  42 U.S.C. § 6297(f)(3)(A).  The Ordinance does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective.  Instead, the builder cannot select *any* appliances that use natural gas, no matter the energy use or efficiency of those particular appliances, because the building cannot connect to natural gas piping.

67.    The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver.  42 U.S.C. § 6297(f)(3)(B).  The Ordinance does not meet this requirement, because it precludes the use of gas appliances that meet the federal standards in Section 6295.  By banning all gas appliances, it necessarily bans those that meet the federal standards.

15

68.     The third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis."  42 U.S.C. § 6297(f)(3)(C).  The Ordinance does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than required by the federal standards.  The Ordinance gives *no* credit for installing natural gas appliances that are more efficient than required by the federal standards; to the contrary, it bars *all* natural gas appliances, without regard to their energy efficiency.  Instead of giving credit based on the efficiency of each covered product, the Ordinance sets out blanket rules about the use of *any* natural gas product.

69.     The sixth requirement is that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost)." 42 U.S.C. § 6297(f)(3)(F).  The Ordinance does not meet this requirement, because it is not specified in terms of *total* consumption of energy for a building that then allows builders to decide how to meet that consumption objective; it says nothing about a consumption or conservation objective or equivalent amounts of energy, but instead allows all electric and bans all natural gas. *Id.*

### Berkeley Does Not Meet The Conditions For Exemption From Preemption for Industrial Appliances.

70.     As with the consumer standards, there are only limited exceptions to the default rule of preemption of local regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(2)(B).

71.     As an initial matter, the Ordinance is not eligible for an exception to preemption because it is not "contained in a State or local building code for new construction[.]" 42 U.S.C. § 6316(2)(B). The Ordinance is instead part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety."  The Berkeley Municipal Code contains a separate section, Title 19, regarding "Buildings and Construction" and containing Berkeley's building code and energy code.

16

The Ordinance is not part of that building code.

72.     Regardless, the Ordinance also does not meet the statutory requirements for the exception to preemption.  To avoid preemption, a local regulation in a building code must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1."  42 U.S.C. § 6316(2)(B)(i).

73.     The Ordinance does not meet this requirement, because it bans all natural gas appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

**The California Building Standards Law**

74.     The California Building Standards Law, Sections 18901 *et seq.* of the California Health and Safety Code ("HSC"), provides for the adoption of statewide building standards in California.

75.     Section 18949.31 of the California Health and Safety Code grants authority to the California Building Standards Commission ("CBSC") to oversee processes related to the California building codes.

76.     By adopting the 1970 amendments to the Building Standards Law, the Legislature demonstrated its intent to occupy the field of building standards.

77.     HSC § 18915 defines a "local agency" as "a city, county, and city and county, whether general law or chartered, district agency, authority, board, bureau, department, commission, or other governmental entity of less than statewide jurisdiction."

78.     HSC § 18919 defines a "regulation" as "any rule, regulation, ordinance, or order promulgated by a state or local agency, including rules, regulations, or orders relating to occupancy or the use of land," including, specifically, "building standards."

79.     HSC § 18909(a) defines a "building standard" as "any rule, regulation, order, or other requirement, including any amendment or repeal of that requirement, that specifically regulates, requires, or forbids the method of use, properties, performance, or types of materials used in the construction, alteration, improvement, repair, or rehabilitation of a building, structure, factory-built housing, or other improvement to real property, including fixtures therein, and as determined by the

17

commission."

80.     These provisions, taken together, have been interpreted as precluding any local regulation in the field of building standards pursuant to the local jurisdiction's police powers, and as requiring that local governments only make any amendment or modification of the state building standards code in accord with a specific statutory grant of authority.

81.     Insofar as building standards concern energy use, the intent of the California legislature was "to establish and consolidate the state's responsibility for energy resources, for encouraging, developing, and coordinating research and development into energy supply and demand problems, and for regulating electrical generating and related transmission facilities." Cal. Pub. Res. Code § 25006.  To do so, California passed the Warren-Alquist Act in 1974, establishing the CEC, to respond to the energy crisis of the early 1970s and the state's unsustainable growing demand for energy resources.

**The California Building Standards Code**

82.     The California Building Standards Code is set forth in Title 24 of the California Code of Regulations and provides for a statewide building standards code.

83.     Part 2.5 of the Building Standards Code is known as the California Residential Code.

84.     Section R1003.11.3 of the Residential Code allows natural gas appliances for fireplaces consistent with the California Mechanical Code.

85.     Part 4 of the Building Standards Code is known as the California Mechanical Code.

86.     The California Mechanical Code contains a number of standards relating to the use of natural gas in structures.  These include:

   a.  Section 1301.1 regulating the maximum pressure for natural gas in piping in a structure;

   b.  Section 1308.4 regulating the sizing of gas piping in the structure;

   c.  Section 1308.4.1 regulating the volumetric flow rate for gas in a structure;

   d.  Section 1308.7 regulating requirements for gas pressure regulators in a structure;

   e.  Section 1310.2.3 specifying prohibited locations for gas piping in a structure;

f.   Section 1312 regulating appliance connections to gas piping in a structure;

g.   Section 1314.1 regulating general requirements for natural gas supply to structures;

h.   Section 1314.2 regulating the required volume of gas at each piping outlet within a structure; and

i.   Section 1314.4 regulating the size of supply piping outlets for gas appliances within a structure.

87.   Part 5 of the Building Standards Code is known as the California Plumbing Code.

88.   The California Plumbing Code contains a number of standards relating to the use of natural gas in structures.  These include:

a.   Section 507.7 requiring that water heaters be connected to the type of fuel gas for which it was designed;

b.   Section 1201.1 regulating the gas pressure within piping systems in connection with a building or structure;

c.   Section 1202.0 regulating the coverage of gas piping systems in a structure;

d.   Section 1202.2 regulating gas piping system requirements in a structure;

e.   Section 1208.1 regulating the installation of gas piping in a structure;

f.   Section 1208.4 regulating the sizing of gas piping systems in a structure;

g.   Section 1208.6 regulating acceptable piping materials and joining methods for gas piping systems;

h.   Section 1210.1.7 regulating the use of plastic piping for gas;

i.   Section 1210.2.2.1 regulating gas piping in ceiling locations; and

j.   Section 1210.2.3 regulating prohibited locations for gas piping inside a building.

89.   Part 6 of the Building Standards Code is known as the California Energy Code.

90.   The California Energy Code establishes certain energy standards and includes requirements applicable to natural gas devices and appliances.  These include:

a.   Section 110.1 establishing mandatory requirements for appliances in newly constructed buildings;

19

b.   Section 110.2(a) and Tables 110.2-C, 110.2-D and 110.2-J establishing efficiency standards for gas engine heat pumps, water-cooled gas engine driven chillers, and gas-fired warm air furnaces, respectively;

c.   Section 110.2(d) regulating gas-fired furnace standby loss controls;

d.   Section 110.4 establishing requirements where gas pool heaters are used;

e.   Section 110.5 regulating gas central furnace and cooking appliance pilot lights;

f.   Section 120.9 regulating gas commercial boilers;

g.   Section 140.4 establishing prescriptive requirements for space conditioning systems;

h.   Section 140.4(g) permitting certain back-up systems for gas heating equipment;

i.   Section 150.0(e) requiring standards for fireplaces, decorative gas appliances, and gas logs;

j.   Section 150.0(n) requiring standards for gas water heaters;

k.   Section 150.1(c)(8) specifying requirements for gas water heating systems.

**Requirements for Local Amendments to State Building Standards Code**

91.   HSC §§ 17958, 17958.5, and 17958.7 permit cities and counties to make local amendments or modifications to the Building Standards Code under specified circumstances.

92.   HSC § 17958.7 requires that before making any such modifications or changes, the governing body of the city or county must "make an express finding that such modifications or changes are reasonably necessary because of local climatic, geological or topographical conditions" and the modifications or changes must be "expressly marked and identified to which each finding refers" and must be submitted to the CBSC.

93.   HSC § 17958.7(b) provides that the CBSC "may" reject a modification or change if no finding is submitted.

94.   Consistent with these provisions, the various parts the Building Standards Code have procedural requirements for more restrictive local amendments or modifications to the Building Standards Code.  The California Residential Code, Title 24, Part 2.5, § 1.1.8 and § 1.1.8.1 require compliance with HSC § 17958 and that the municipality "make express findings for each

20

amendment, addition or deletion based upon climatic, topographical, or geological conditions" and "file the amendments, additions or deletions expressly marked and identified as to the applicable findings" with the CBSC.

95.     The California Mechanical Code, Title 24, Part 4, § 1.1.8 and § 1.1.8.1, and the California Plumbing Code, Title 24, Part 5, § 1.1.8 and § 1.1.8.1, likewise require compliance with HSC § 17958 and that the municipality "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions" and "file the amendments, additions or deletions expressly marked and identified as to the applicable findings" with the CBSC.

96.     In order for local governmental agencies to amend or modify the state energy standards, they must meet additional, more burdensome requirements and the CEC must then vote to approve the amendments.  Pursuant to Title 24, Part 1, § 10-106, the local government must submit an application to the CEC for approval including the "proposed energy standards;  [t]he local governmental agency's findings and supporting analyses on the energy savings and cost effectiveness of the proposed energy standards; [a] statement or finding by the local governmental agency that the proposed energy standards will require buildings to be designed to consume less energy than permitted by [the Energy Code]; and [a]ny findings, determinations, declarations or reports, including any negative declaration or environmental impact report, required pursuant to the California Environmental Quality Act, Pub. Resources Code Section 21000 et seq." *Id.* § 10-106(b).  The CEC must find that the proposed standards will require buildings to be designed to consume less energy than permitted by the Building Standards Code and must approve the standards before they are effective. *Id.* § 10-106.

97.     The CEC itself has recognized that bans on natural gas constitute modifications to the energy code that require its approval.  Indeed, the CEC recently reviewed and approved several other city's ordinances banning natural gas infrastructure, including in Los Gatos, Mountain View, Santa Rosa, and Windsor. The CEC issued resolutions approving these "locally adopted building energy efficiency standards," and finding that they met the state code requirements for amending the Energy Code.  All four of these cities' ordinances require that "new construction" "shall" be "all-electric"

and prohibit the use of natural gas infrastructure.  Unlike these four cities, however, Berkeley has not submitted its Ordinance for the CEC's review and approval.

## FIRST CAUSE OF ACTION

### FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

98.     Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

99.     The Berkeley Ordinance in its entirety is preempted by the federal EPCA.

100.     There is no set of circumstances under which the Ordinance would be valid.

101.     The Berkeley Ordinance concerns the energy efficiency and energy use of all appliances in newly constructed buildings, including appliances covered by the EPCA.

102.     The Berkeley Ordinance does not fall within the exceptions to preemption in the EPCA because:

 a. It is not included in Berkeley's building code;

 b. It does not set its objectives in terms of total consumption of energy;

 c. It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather requires a particular category of items (i.e., electric appliances);

 d. It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as it gives no credit for (and indeed bans) the use of natural gas appliances no matter their efficiency; and/or

 e. It bans all natural gas appliances, even when they meet the federal efficiency standards.

103.     There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff and its members.  Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

104.     Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by the EPCA and enjoin Defendant from enforcement of the preempted Berkeley

22

1    Ordinance.

2                                    **SECOND CAUSE OF ACTION**

3    **PREEMPTION OF BERKELEY ORDINANCE BY CALIFORNIA LAW AS A VOID AND**

4                    **UNENFORCEABLE EXERCISE OF POLICE POWER**

5           105.    Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

6           106.    Defendant has a clear, present, and ministerial duty to comply with the laws of the

7    State of California, which prohibit a municipality from exercising its police powers to establish

8    building code requirements and preempt all ordinances that establish building code requirements

9    under the police power of the municipality.

10          107.    Plaintiff and its members have a clear, present, and beneficial interest in the

11   performance of Defendant's duties under California law.

12          108.    Article XI, section 7 of the California Constitution provides that municipalities may

13   enact and enforce ordinances "not in conflict with general laws."

14          109.    Under this provision, any ordinance that conflicts with state law or enters an area fully

15   occupied by state general law is preempted and void.

16          110.    Under the California Building Standards Law and Building Standards Code, the State

17   of California has occupied the field of building standards.

18          111.    Because the state has occupied the field of building standards, local governments may

19   not use their general police powers to regulate in the area of building standards and may only exercise

20   those powers in accord with a specific statutory grant of authority. *Building Indus. Ass'n v. City of*

21   *Livermore*, 45 Cal. App. 4th 719, 726 (1996).

22          112.    A building standard adopted by a municipality under general police power is

23   preempted by state law and is unenforceable and void.

24          113.    The Berkeley Ordinance establishes building standards as defined in the Building

25   Standards Law and was adopted under Berkeley's general police power.  The Berkeley Ordinance is

26   therefore preempted by state law and void and unenforceable.

27          114.    There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff

28

                                                23

and its members.  Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

115.    Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by California law and enjoin Defendant from enforcement of the preempted Berkeley Ordinance.

## THIRD CAUSE OF ACTION

## PREEMPTION OF BERKELEY ORDINANCE BY CALIFORNIA LAW AS CONFLICTING WITH CALIFORNIA BUILDING STANDARDS CODE

116.    Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

117.    Under California law, local amendments or modifications to the California Building Standards Code are preempted unless the amendments or modifications are adopted under a specific statutory grant of authority.

118.    HSC § 17958.7 and California Mechanical Code, Title 24, Part 4, § 1.1.8 and § 1.1.8.1, and California Plumbing Code, Title 24, Part 5, § 1.1.8 and § 1.1.8.1, require that to make any such amendment or modification to the California Building Standards Code, the municipality must "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions" and "file the amendments, additions or deletions expressly marked and identified as to the applicable findings" with the CBSC.

119.    The Berkeley Ordinance establishes building standards as defined by HSC § 18909 and conflicts with, amends, and modifies provisions of the California Building Code, including:

    a.    California Mechanical Code § 1301.1 regulating the maximum pressure for natural gas in piping in a structure; § 1308.4 regulating the sizing of gas piping in the structure; § 1308.4.1 regulating the volumetric flow rate for gas in a structure; § 1308.7 regulating requirements for gas pressure regulators in a structure; § 1310.2.3 specifying prohibited locations for gas piping in a structure; § 1312 regulating appliance connections to gas piping in a structure; § 1314.1 regulating general requirements for

24

natural gas supply to structures; § 1314.2 regulating the required volume of gas at each piping outlet within a structure; and § 1314.4 regulating the size of supply piping outlets for gas appliances within a structure; and

   b.  California Plumbing Code § 507.7 requiring that water heaters be connected to the type of fuel gas for which it was designed; § 1201.1 regulating the gas pressure within piping systems in connection with a building or structure; § 1202.0 regulating the coverage of gas piping systems in a structure; § 1202.2 regulating gas piping system requirements in a structure; § 1208.1 regulating the installation of gas piping in a structure; § 1208.4 regulating the sizing of gas piping systems in a structure; § 1208.6 regulating acceptable piping materials and joining methods for gas piping systems; § 1210.1.7 regulating the use of plastic piping for gas; § 1210.2.2.1 regulating gas piping in ceiling locations; and § 1210.2.3 regulating prohibited locations for gas piping inside a building.

120.    The Berkeley Ordinance does not provide that it is relying on any specific statutory exception to preemption.

121.    The Berkeley Ordinance does not expressly mark or identify any provisions of the California Building Code, including the provisions of the Mechanical Code and Plumbing Code cited above, that it is amending or modifying.  Nor does Berkeley "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions."

122.    On information and belief, Berkeley filed its Ordinance with the CBSC after the initial Complaint in this case had been filed.

123.    Because the Berkeley Ordinance was not adopted in compliance with any specific statutory grant of authority, it is preempted and void and unenforceable.

124.    Defendant has a clear, present, and ministerial duty to comply with the laws of the State of California, which preempt all ordinances that establish building code requirements except where the building code requirements are adopted in compliance with specific statutory grants of authority.

125.     Plaintiff and its members have a clear, present, and beneficial interest in the performance of Defendant's duties under California law.

126.     There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff and its members.  Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

127.     Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by California law and enjoin Defendant from enforcement of the preempted Berkeley Ordinance.

## FOURTH CAUSE OF ACTION

### PREEMPTION OF BERKELEY ORDINANCE BY CALIFORNIA LAW AS CONFLICTING WITH CALIFORNIA ENERGY CODE

128.     Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

129.     Under California law, local amendments or modifications to the California Energy Code are preempted unless the amendments or modifications are adopted under a specific statutory grant of authority.

130.     The California Energy Code requires that in order for local governmental agencies to adopt energy standards amending or modifying the Energy Code, a local governmental agency must submit to the CEC an application including the proposed energy standards; findings and supporting analyses on energy savings and cost-effectiveness; a statement or finding that the local energy standards will require buildings to be designed to consume less energy than permitted by Part 6; and any findings required pursuant to CEQA.  Title 24, Part 1, § 10-106(b).

131.     In order for such local amendments to be effective, the CEC must find that the standards will require buildings to be designed to consume less energy than permitted by Title 24, Part 6, and must vote to approve the local standards. Title 24, Part 6, § 10-106.

132.     The Berkeley Ordinance conflicts with, amends, and modifies provisions of the California Energy Code establishing energy standards and requirements applicable to natural gas

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                    4:19-cv-7668-YGR

devices and appliances, including: § 110.0 establishing mandatory requirements for appliances in newly constructed buildings; § 110.2(a) and Tables 110.2-C, 110.2-D and 110.2-J establishing efficiency standards for gas engine heat pumps, water-cooled gas engine driven chillers and gas-fired warm air furnaces, respectively; § 110.2(c) regulating thermostats for fireplaces and decorative gas appliances; § 110.2(d) regulating gas-fired furnace standby loss controls; § 110.4 establishing requirements where gas pool heaters are used; § 110.2(d) regulating gas-fired furnace standby loss; § 110.5 regulating gas central furnace, cooking appliance pilot lights; § 120.9 regulating gas commercial boilers; § 140.4(c) establishing prescriptive requirements for space conditioning systems; § 140.4(g) permitting certain back-up systems for gas heating equipment; § 150.0(e) setting standards for fireplaces, decorative gas appliances, and gas logs; § 150.0(n) setting standards for gas water heaters; § 150.1(b)(8) specifying requirements for gas water heating systems.

133.    The Berkeley Ordinance did not identify the provisions of the Energy Code it was amending; make findings or provide supporting analyses on energy savings and cost-effectiveness; make a finding that the proposed standards will require less energy than permitted by Part 6; or make findings or declarations pursuant to CEQA.  On information and belief, Defendant has not submitted an application to the CEC for the Berkeley Ordinance as of the date of this Amended Complaint and does not intend to do so.

134.    The Berkeley Ordinance is accordingly preempted by the CEC and is void and unenforceable.

135.    Plaintiff and its members have a clear, present, and beneficial interest in the performance of Defendant's duties under California law.

136.    There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff and its members.  Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

137.    Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by California law and enjoin Defendant from enforcement of the preempted Berkeley

Ordinance.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.      For a permanent injunction enjoining Defendant from enforcing or attempting to enforce Berkeley Ordinance No. 7,672-N.S. as that Ordinance is preempted by California law and federal law and does not satisfy any exception to such preemption, and is accordingly void and unenforceable;

      a.  The Berkeley Ordinance has caused and threatens to cause Plaintiff and its members irreparable and substantial harm;

      b.  No amount of monetary damages or other legal remedy can adequately compensate Plaintiff and its members for the irreparable harm that they will suffer from the violations described herein, and Plaintiff has no plain, speedy, and adequate remedy at law, in that unless Defendant is enjoined by this Court from effectuating the Berkeley Ordinance, Plaintiff and its members will be subject to the Berkeley Ordinance and will continue to be denied their legal rights;

      c.  There will be no significant harm to Defendant from an injunction, because Defendant has no legitimate interest in enforcing an invalid ordinance.  Moreover, the Ordinance's stated goals are primarily global, relating to issues of global warming and climate change. Ordinance 12.80.010.A.  In light of the incremental effect, if any, that an Ordinance in one city would have on global warming or climate change, there is little likelihood that an injunction would cause substantial harm to the Defendant.  The balance of harms thus favors injunctive relief; and

      d.  An injunction is also in the public interest.  The public interest is not served by enforcing invalid ordinances.  Moreover, the EPCA embodies a strong public interest in the uniform, *national* regulation of energy conservation and use policy, which is undermined by conflicting local regulation of these matters found in the Berkeley Ordinance.  California law likewise embodies a strong public interest in the uniform state-wide regulation of building standards and energy conservation and use policy, which is also undermined by

local regulation not exercised pursuant to specific statutory grants of authority.

2.      For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331,  that Berkeley Ordinance No. 7,672-N.S.

     a.  Is preempted by federal law because it concerns the energy use of appliances covered in the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

     b.  Is preempted by California law as an unlawful attempt to use the City of Berkeley's general police power to regulate building standards and is therefore void and unenforceable;

     c.  Is preempted by California law as it attempts to regulate building standards and does not satisfy the limited specific statutory exception for municipal building standards and is therefore void and unenforceable; and

     d.  Is preempted by California law as it has the effect of amending the state Energy Code and does not satisfy the limited specific statutory exception for municipal amendments to the Energy Code and is therefore void and unenforceable.

3.      For costs of this suit, including reasonable attorney's fees; and

4.      For such other and further relief as the Court may deem just and proper.

29

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                4:19-cv-7668-YGR

Dated:  August 14, 2020

Respectfully submitted,

**REICHMAN JORGENSEN LLP**

*/s/ Courtland L. Reichman*
Courtland L. Reichman (CA Bar No. 268873)
Laura Carwile (CA Bar No. 291906)
creichman@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449

Sarah Jorgensen (*Pro Hac Vice*)
sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Facsimile: (650) 623-1449

Gary J. Toman (*Pro Hac Vice*)
gtoman@wwhgd.com
WEINBERG, WHEELER, HUDGINS, GUNN &
DIAL LLP
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433

Kylie Chiseul Kim (*Pro Hac Vice*)
kkim@kellogghansen.com
KELLOGG, HANSEN, TODD, EVANS, FIGEL
& FREDERICK LLP
1615 M St. NW, #400
Washington, DC 20036
Telephone: (202) 326-7924
Facsimile: (202) 326-7999

*Attorneys for Plaintiff*
*California Restaurant Association*

30