Courtland L. Reichman (CA Bar No. 268873)
Laura Carwile (CA Bar No. 291906)
**REICHMAN JORGENSEN LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449
creichman@reichmanjorgensen.com
lcarwile@reichmanjorgensen.com

Sarah Jorgensen (*Pro Hac Vice*)
**REICHMAN JORGENSEN LLP**
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Facsimile: (650) 623-1449
sjorgensen@reichmanjorgensen.com

Gary J. Toman (*Pro Hac Vice*)
**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL LLP**
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433
gtoman@wwhgd.com

Kylie Chiseul Kim (*Pro Hac Vice*)
**KELLOGG, HANSEN, TODD, EVANS, FIGEL & FREDERICK LLP**
1615 M St NW #400
Washington, DC 20036
Telephone: (202) 326-7924
Facsimile: (202) 326-7999
kkim@kellogghansen.com

*Attorneys for Plaintiff*
*California Restaurant Association*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation, <br><br> Plaintiff, <br> v. <br><br> CITY OF BERKELEY, <br><br> Defendant. | Case No. 4:19-cv-07668-YGR <br><br> **CALIFORNIA RESTAURANT ASSOCIATION'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT** <br><br> Judge: Hon. Yvonne Gonzalez Rogers <br> Action Filed: Nov. 21, 2019 |

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF ISSUES ............................................................................................. 2

BACKGROUND ................................................................................................................ 3

    A.   Berkeley's Ban On Natural Gas ........................................................................... 3

    B.   The Federal Energy Policy And Conservation Act .......................................... 4

    C.   California Law Regarding Local Energy And Building Regulations ...................... 6

    D.   The California Restaurant Association .................................................................. 7

ARGUMENT ..................................................................................................................... 7

   I.    THE CRA HAS STANDING .............................................................................. 7

      A.   A CRA Member Wishes To Operate A Restaurant In Berkeley Using Natural
          Gas Appliances. ..................................................................................................... 8

      B.   CRA Members Use Appliances Covered By The EPCA. .................................. 9

   II.   THIS DISPUTE IS RIPE .................................................................................. 12

  III.   AS A REGULATION CONCERNING ENERGY USE, THE ORDINANCE IS
        EXPRESSLY PREEMPTED BY THE EPCA. ............................................... 14

      A.   The Ordinance Concerns Energy Use Of EPCA-Covered Products.................... 16

      B.   The Structure of the EPCA Underscores The Preemption Of Berkeley's Ordinance. ......... 18

      C.   The Legislative History Underscores Congress's Intent To Stop Local Governments
          From Adopting Inconsistent Rules For EPCA-Covered Appliances. ................................. 20

      D.   The Exemptions In The Ordinance Have No Bearing On Express Preemption. .................. 22

  IV.   BERKELEY'S GAS BAN IS PREEMPTED BY STATE LAW. .................................... 23

      A.   Berkeley's Ban Is An Invalid Exercise Of The Police Power And Is Preempted. ............... 23

      B.   Berkeley's Ban Is Preempted By The California Building Code. .................................... 23

      C.   Berkeley's Ban Is Preempted By The California Energy Code. .................................... 24

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                      **Page(s)**

*Acri v. Varian Assocs., Inc.*,
  114 F.3d 999 (9th Cir. 1997) (en banc) .................................................................... 25

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
  410 F.3d 492 (9th Cir. 2005) ........................................................................ *passim*

*Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*,
  2008 WL 5586316 (D.N.M. Oct. 3, 2008) ......................................................... *passim*

*Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*,
  835 F. Supp. 2d 1133 (D.N.M. 2010) ...................................................................... 15

*Algonquin Gas Transmission, LLC v. Town of Weymouth*,
  365 F. Supp. 3d 147 (D. Mass. 2019) ...................................................................... 14

*Alvarez v. IBP, Inc.*,
  339 F.3d 894 (9th Cir. 2003) .................................................................................. 25

*Am. Fed'n of Teachers v. Devos*,
  2020 WL 5257561 (N.D. Cal. Sept. 3, 2020) ............................................................. 9

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ................................................................................ 20

*Cal. Tow Truck Ass'n v. City and County of San Francisco*,
  693 F.3d 847 (9th Cir. 2012) .................................................................................. 14

*City of Auburn v. Qwest Corp.*,
  260 F.3d 1160 (9th Cir. 2001), overruled on other grounds by *Sprint Telephony PCS,
  L.P. v. Cty. of San Diego*, 543 F.3d 571 (9th Cir. 2008) ............................................. 13

*Clark v. City of Seattle*,
  899 F.3d 802 (9th Cir. 2018) .................................................................................. 14

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993) .............................................................................................. 22

*Ctr. for Food Safety v. Vilsack*,
  2016 WL 4698901 (N.D. Cal. Sept. 8, 2016) ............................................................ 18

*Desert Citizens Against Pollution v. Bisson*,
  231 F.3d 1172 (9th Cir. 2000) .................................................................................. 9

*Follman v. Hosp. Plus of Carpentersville, Inc.*,
  532 F. Supp. 2d 960 (N.D. Ill. 2007) ....................................................................... 18

*Gobeille v. Liberty Mut. Ins. Co.*,
    136 S. Ct. 936 (2016) ...................................................................................................... 22

*Gordon v. Virtumundo, Inc.*,
    575 F.3d 1040 (9th Cir. 2009) ...................................................................................... 18

*Harris v. Bd. of Supervisors, L.A. Cty.*,
    366 F.3d 754 (9th Cir. 2004) .......................................................................................... 7

*Harris v. Mexican Speciality Foods, Inc.*,
    564 F.3d 1301 (11th Cir. 2009) .................................................................................... 13

*Jensen v. Cty. of Sonoma*,
    2010 WL 2330384 (N.D. Cal. June 4, 2010), aff'd, 444 F. App'x 156 (9th Cir. 2011) ............... 12

*L.A. Cty. Bar Ass'n v. Eu*,
    979 F.2d 697 (9th Cir. 1992) ........................................................................................ 13

*Leite v. Crane Co.*,
    749 F.3d 1117 (9th Cir. 2014) ........................................................................................ 9

*Murphy v. New Milford Zoning Comm'n*,
    402 F.3d 342 (2d Cir. 2005) .......................................................................................... 14

*N. Cal. Power Agency v. United States*,
    122 Fed. Cl. 111 (2015) ................................................................................................. 18

*Nat'l Sur. Corp. v. India Tea & Spices, Inc.*,
    2012 WL 113608 (D. Mass. Jan. 12, 2012) .................................................................. 10

*Nat'l Treasury Emps. Union v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006) ...................................................................................... 14

*NE Hub Partners, L.P. v. CNG Transmission Corp.*,
    239 F.3d 333 (3d Cir. 2001) .......................................................................................... 13

*O'Dowd v. Anthem Health Plans, Inc.*,
    2015 WL 5728814 (D. Colo. Sept. 30, 2015) .............................................................. 18

*Pac. Gas and Elec. Co. v. State Energy Res. Convservation & Dev. Com'n*,
    461 U.S. 190 (1983) ................................................................................................. 13, 14

*Pac. Legal Found. v. State Energy Res. Conservation & Dev. Com'n*,
    659 F.2d 903 (9th Cir. 1981) ........................................................................................ 12

*Patel v. Facebook Inc.*,
    290 F. Supp. 3d 948 (N.D. Cal. 2018) .......................................................................... 11

*Ret. Fund Tr. of Plumbing v. Franchise Tax Bd.*,
   909 F.2d 1266 (9th Cir. 1990) ......................................................................... 18

*Roe No. 2 v. Ogden*,
   253 F.3d 1225 (10th Cir. 2001) ....................................................................... 13

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
   629 F. Supp. 2d 1123 (E.D. Cal. 2009) ........................................................... 18

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004) ......................................................................9, 11

*Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*,
   711 F.2d 138 (9th Cir. 1983) ........................................................................... 11

*Thomas v. Anchorage Equal Rights Com'n*,
   220 F.3d 1134 (9th Cir. 2000) ......................................................................... 12

*United States v. Arizona*,
   641 F.3d 339 (9th Cir. 2011) ........................................................................... 14

*United States v. Salerno*,
   481 U.S. 739 (1987) ......................................................................................... 13

*United States v. Supreme Court of N.M.*,
   980 F. Supp. 2d 1334 (D.N.M. 2013).............................................................. 13

**State Cases**

*ABS Institute v. City of Lancaster*,
   24 Cal. App. 4th 285 (1994) ............................................................................ 23

*Briseno v. City of Santa Ana*,
   6 Cal. App. 4th 1378 (1992) ..........................................................................6, 23

*Building Ind. Ass'n v. City of Livermore*,
   45 Cal. App. 4th 719 (1996) ............................................................................ 23

*Yamaha Corp. of Am. v. State Bd. of Equalization*,
   19 Cal. 4th 1 (1998)......................................................................................... 25

**Federal Statutes**

28 U.S.C. § 1367(c) ............................................................................................... 25

42 U.S.C. § 6291 ...........................................................................................*passim*

42 U.S.C. § 6292 ............................................................................................6, 10, 15

42 U.S.C. § 6297 ............................................................................................*passim*

42 U.S.C. § 6311 ............................................................................................ 10, 15, 16

**State and Local Statutes**

Berkeley Municipal Code §§ 12.80.010 et seq. ..............................................*passim*

Cal. Pub. Res. Code § 25402.1 .................................................................................24

Code Cal. Reg. § 10-106 ...................................................................................... 7, 24

**Other Authorities**

S. Rep. 100-6 (1987) ..................................................................................... 5, 18, 21

The California Restaurant Association (the "CRA") hereby opposes the Motion to Dismiss First Amended Complaint ("Motion," ECF No. 47) filed by the City of Berkeley ("Berkeley" or the "City").

## INTRODUCTION

Berkeley's first-of-its-kind ban on natural gas attempts an end-run around federal and state law. Berkeley was acutely aware of this when it passed the Ordinance. It decided that federal and state energy law was not moving quickly enough, and it wanted to create a test case in which it sought to bypass the federal and state regulatory framework. In particular, Berkeley realized it could not ban gas appliances under federal law, and it could not amend the state Energy Code without following "laborious" procedures. So it attempted to do indirectly what it could not do directly. It could not ban gas appliances, so it banned the pipes connected to gas appliance. It could not ban piping in the state building code without following state procedures, so it claimed it was using only its police powers to regulate health and safety. The law does not permit Berkeley to do indirectly what it is precluded from doing directly.

Energy policy is complex and takes into account multiple interests and concerns. The federal government has claimed areas of regulation — as reflected in EPCA preemption here — and what it does not claim is left to states if they follow certain requirements. In turn, California permits local governments to pass laws relating to energy in very circumscribed circumstances — most energy policy is by statute set at the state level. The reason for this deliberate federal and state balance is to avoid a patchwork of state and local regulations that quickly becomes impractical and undermines efforts to achieve important policy goals due to thousands of local governments each embarking on its own energy policy through local regulation.

The EPCA broadly preempts state regulation "concerning the . . . energy use . . . of [a] covered product. . . ." The legislative history shows that Congress intended this preemption to be broad, but specific ground is returned to the state and local governments in the form of exemptions. Those exemptions are focused on allowing state and local building codes to set higher overall energy efficiency or energy consumption objectives so long as builders retain the choice of how to use various building components to meet those objectives. They reflect a concern that state and local governments not prioritize certain forms of energy or types of products over others — such as preferring electric over gas

appliances, as Berkeley has done here.

Berkeley's Ordinance concerns the energy use of covered products, and therefore is preempted by the EPCA. "Energy use" is defined as "the quantity of energy directly consumed by" the relevant product. Berkeley's Ordinance has dictated that the quantity is zero. While Berkeley disputes whether CRA members would use products covered by the EPCA, that is a merits and fact question beyond the scope of a motion to dismiss. Finally, while the EPCA gives back some of what it preempts through the exemptions, those exemptions are not at issue here. Berkeley does not claim its Ordinance qualifies for the exemptions, nor could it, because the exemptions require the local law to give builders a choice of energy sources to meet an overall energy efficiency or consumption objective. The case law looks at whether the plaintiff has stated a plausible claim at this early Rule 12(b)(6) stage, and the CRA here has readily surpassed this low bar.

The CRA understood that the Court asked for this round of briefing to focus on whether the CRA has satisfied the Rule 12(b)(6) standard on its EPCA preemption claim. Berkeley has rehashed a whole host of other issues raised in its prior briefing, necessarily limiting the pages that can be devoted to briefing the EPCA issue. The CRA has standing and the case is ripe based on the allegations in the Amended Complaint, which were updated as directed by the Court. The Ordinance's exemptions do not undermine standing and ripeness, since there is no requirement that a plaintiff apply for a permit to bring a facial challenge. The CRA has stated a claim for state preemption as well — Berkeley effectively admits it bypassed state legal requirements for passing an ordinance such as this.

The CRA respectfully requests that the Court deny Berkeley's motion to dismiss.

## STATEMENT OF ISSUES

1. Does the CRA have standing to assert its claims?

2. Are the CRA's claims ripe?

3. Has the CRA plausibly pleaded that the Ordinance concerns energy use and is thus preempted under federal law?

4. Has the CRA plausibly pleaded that Berkeley did not comply with state statutory requirements for modifications to the state code?

## BACKGROUND

### A. Berkeley's Ban On Natural Gas

When Berkeley first considered banning the use of natural gas in new buildings, it recognized that a natural gas ban would require compliance with state regulatory procedures that were "laborious," "cumbersome," and "complex." Am. Compl. ¶ 21. Berkeley's council members also recognized that, "[t]o date, the federal, state and local approach to energy use in new buildings has largely been to mandate greater building efficiency and energy conservation, which indirectly results in lower emissions, but does not directly phase out fossil fuel consumption in new buildings." *Id.* ¶ 23. Berkeley was dissatisfied with this approach and wanted an outright ban on natural gas instead. Berkeley therefore "abandon[ed] the reach code strategy" and pivoted to "a new approach" that would "avoid[] CEC regulations associated with asking permission to amend energy efficiency standards." *Id.* ¶¶ 21-22 (citing, *inter alia*, City of Berkeley Action Calendar (July 9, 2019)). Under this new approach, Berkeley would refuse to grant permits for buildings that use natural gas, thereby eliminating the use of natural gas and natural gas appliances in new buildings while purportedly avoiding state and federal regulations. As Berkeley acknowledged, "[t]he effect of this legislation will be that builders will be prohibited from applying for permits for land uses that include gas infrastructure[.]" *Id.* ¶ 22.

In August 2019, Berkeley adopted Ordinance No. 7,672-N.S., Berkeley Municipal Code §§ 12.80.010 et seq. (the "Ordinance"), prohibiting natural gas infrastructure in newly constructed buildings in Berkeley. Am. Compl. ¶¶ 24-25. Berkeley adopted the Ordinance as part of the Berkeley Municipal Code Title 12, the Health and Safety Code, and provided that its requirements "shall apply to Use Permit or Zoning Certificate applications[.]" *Id.* ¶¶ 26-27. The Ordinance was not enacted as part of the Municipal Code Title 19, regulating "Buildings and Construction," which contains Berkeley's building and energy codes. *Id.* ¶¶ 27-32. The Ordinance went into effect on January 1, 2020. *Id.* ¶ 25.

Berkeley's ban has two purported "exemptions." *Id.* ¶ 28. The first, which allows gas where all-electric is "not physically feasible," Ordinance § 12.80.040.A.1, is merely a means for Berkeley to "phas[e] in" the ban as the CEC makes all-electric construction available for additional building types. Am. Compl. ¶ 28. This provision does not offer any "exemption" for the types of buildings already

covered by the ban. The second exemption allows natural gas if the City finds it to be in the "public interest" based on (a) other alternatives that are available, and (b) issues of safety, health, or welfare of the public, Ordinance § 12.80.050.A — issues as to which the Ordinance itself already indicates the answer.

## B. The Federal Energy Policy And Conservation Act

The Energy Policy and Conservation Act ("EPCA") was first passed during the oil crisis in 1975, to create a "comprehensive energy policy" to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." Am. Compl. ¶ 36 (quoting *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005)). In its original form in 1975, the EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency, Am. Compl. ¶ 39, but "provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective." *Id.* (quoting *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499). The Congressional record memorializes Congress's intent at the time: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." *Id.* In that early form, the EPCA permitted significant state involvement in appliance regulation. *Id.* ¶ 40. It "allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Id.* (quoting *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499).

However, in 1978, Congress passed a range of statutes collectively known as the National Energy Act ("NEA"). One of those statutes, the National Energy Conservation and Policy Act ("NECPA"), amended the 1975 EPCA. *Id.* ¶¶ 41-42. Rather than relying exclusively on labeling, NECPA "required the DOE to prescribe minimum energy efficiency standards" for certain products. *Id.* ¶ 42 (quoting *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499). NECPA also strengthened the preemption provisions in the EPCA, allowing state regulations "*only* if the Secretary found there was a significant

state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Id.* (quoting *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499) (emphasis in original). In spite of these new requirements in NECPA, the Department of Energy did not adopt federal minimum energy standards. *Id.* ¶ 43. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." *Id.* (quoting S. Rep. No. 100-6, at 4 (1987)).

Congress responded by again amending the EPCA through the National Appliance Energy Conservation Act ("NAECA"). *Id.* ¶ 44. The purpose of the 1987 amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." *Id.* (quoting S. Rep. No. 100-6, at 1 (1987)). As the Senate and House both recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id.* ¶ 45 (quoting S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987)). Under the NAECA amendment, while states still could seek permission to establish their own standards, "achieving the waiver is difficult." *Id.* ¶ 47 (quoting S. Rep. No. 100-6, at 2 (1987)). It would require showing an unusual and compelling local interest, and the waiver could not be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.* Moreover, of particular interest here, Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* (quoting S. Rep. No. 100-6, at 10-11 (1987)). To avoid preemption, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.*

In its current form, the EPCA, 42 U.S.C. §§ 6201 et seq., regulates the energy efficiency and energy use of a variety of consumer and industrial products. *Id.* ¶ 48-49, 52. The EPCA's standards for consumer products, a defined term in the EPCA, cover a variety of appliances, including water heaters,

furnaces, dishwashers, and kitchen stoves. *Id.* ¶ 54; 42 U.S.C. §§ 6291(2), 6292(a). These consumer standards explicitly preempt state and local regulations "concerning the energy efficiency" and "energy use" of the products covered by the EPCA. Am. Compl. ¶ 52; 42 U.S.C. §§ 6297(c). The EPCA contains only specific exceptions to this general rule of preemption, requiring state and local regulations to meet seven statutory criteria to qualify for exemption. Am. Compl. ¶¶ 64-69; 42 U.S.C. § 6297(f)(3)(A)-(G).

C.   **California Law Regarding Local Energy And Building Regulations**

The California Legislature also has enacted state-wide policies for certain aspects of energy policy and building standards and has manifested its intent to preempt the field of building standards. Am. Compl. ¶¶ 74, 76; *Briseno v. City of Santa Ana*, 6 Cal. App. 4th 1378, 1381-82 (1992). The California Building Standards Law, Sections 18901 et seq. of the California Health and Safety Code ("HSC"), defines a building standard as "any rule, regulation, order, or other requirement . . . that specifically regulates, requires, or forbids the method of use, properties, performance, or types of materials used in the construction . . . of a building." Am. Compl. ¶ 79; HSC § 18909(a).

The California Building Standards Code (together with the California Building Standards Law, "Building Code"), set forth in Title 24 of the California Code of Regulations, regulates a variety of aspects of energy use in buildings, including infrastructure for and installation of natural gas appliances. Am. Compl. ¶¶ 82-90. Specifically, Part 2.5 of the Building Code, known as the California Residential Code, allows natural gas appliances for fireplaces. *Id.* ¶¶ 83-84. Part 4, the California Mechanical Code, regulates matters such as the maximum pressure for natural gas in piping in a structure, the size of gas piping, and appliance connections to gas piping. *Id.* ¶¶ 85-86. Part 5, the California Plumbing Code, contains regulations of gas piping and gas piping systems. *Id.* ¶¶ 87-88. Part 6, the California Energy Code ("Energy Code"), establishes certain energy standards and includes requirements applicable to natural gas appliances, including, by way of example, requirements for appliances in newly constructed buildings such as efficiency standards for gas engine heat pumps, gas fired warm air furnaces, and gas water heaters and systems. *Id.* ¶¶ 89-90. The Building Code thus permits installation of gas infrastructure and use of gas appliances in newly constructed buildings so long as these standards are met.

These provisions of the Building Code preempt local regulation of these matters. *Id.* ¶¶ 80-81.

Where a local government desires to amend the Building Code, it must expressly make findings of local necessity and identify each amendment and the findings applicable to each. *Id.* ¶¶ 91-95. The amendments must be filed with the California Building Standards Commission ("CBSC") before they can become effective. *Id.* Additional requirements apply where a local government desires to amend the Energy Code (which is part of the Building Code). Local entities must submit applications to the California State Energy Resources Conservation and Development Commission, also known as the California Energy Commission ("CEC"), for approval, including (1) the proposed energy standards; (2) "findings and supporting analyses on the energy savings and cost effectiveness of the proposed energy standards;" (3) a finding that the proposed standards "will require buildings to be designed to consume less energy;" and (4) any determination "required pursuant to the California Environmental Quality Act." *Id.* ¶ 96; Cal. Code Reg. § 10-106.

### D.   **The California Restaurant Association**

The CRA brought this case because it has members that do or seek to do business in Berkeley, who are harmed by the Ordinance. Am. Compl. ¶ 15. Its members "rely on gas for cooking particular types of food, whether it be flame-seared meats, charred vegetables, or the use of intense heat from a flame under a wok," as well as for heating space and water, for backup power, and for affordable power. *Id.* ¶ 8. The CRA's members "will be unable to prepare many of their specialties without natural gas," and will lose speed and control over the "manner and flavor of food preparation." *Id.* Berkeley's Ordinance harms its members, who will not be able to move into or build new buildings and still prepare food in the manner and speed necessary, or use a reliable and affordable energy source. *Id.* ¶¶ 8, 14-15.

<u>ARGUMENT</u>

## I.   <u>THE CRA HAS STANDING.</u>

To establish standing, the CRA must show an injury in fact, a causal connection between the injury and the conduct (here, the Ordinance), and that the injury is redressable by a court decision. *See Harris v. Bd. of Supervisors, L.A. Cty.*, 366 F.3d 754, 760 (9th Cir. 2004) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). When Berkeley filed its Motion to Dismiss the initial complaint in this case, the Court stated that "it seems to me that standing as a technical matter exists." Hearing Tr.

7:3-5. Berkeley demanded, however, that the CRA explicitly allege that it had a member who wanted to operate a restaurant using natural gas appliances in a *newly constructed* building. *Id.* at 9:21-10:1. The Amended Complaint explicitly addresses Berkeley's objection:

> The CRA has one or more members who are interested in opening a new restaurant or in relocating a restaurant *to a new building* in Berkeley after January 1, 2020, but who cannot do so because of the Ordinance's ban on natural gas. One or more members would seek to open or relocate a restaurant in a new building in Berkeley but for the ban on natural gas. The CRA's members will be irreparably harmed by the Berkeley Ordinance through the loss of the ability to use natural gas appliances in newly constructed buildings.

Am. Compl. ¶ 15 (emphasis added). The Court urged Berkeley to "spend less time . . . on ripeness and standing" in the next round of briefing. Hearing Tr. at 41:24-42:9.

### A. A CRA Member Wishes To Operate A Restaurant In Berkeley Using Natural Gas Appliances.

The CRA alleges that it has a member who wants to operate a restaurant in a new building in Berkeley using gas appliances. That allegation is legally sufficient to establish standing. *See* Opp. to First MTD, ECF No. 22, at 11-12 (describing why the nominal availability of exemptions to the ordinance does not change the standing analysis); *id.* at 13 (describing why the CRA does not need to name a specific member). In both motions to dismiss, Berkeley argued that the CRA lacks standing because its complaint did not identify "a member who has applied for and been denied a permit to install Natural Gas Infrastructure in" a newly constructed building. Berkeley's First MTD, ECF No. 18, at 10 ("First MTD"); Motion at 6-10.[1] There is no legal requirement that a person raising a facial challenge to an ordinance apply for an exemption. *See* Opp. to First MTD at 17 (explaining that a facial challenge "does not depend on the particular application of the Ordinance"); *see infra*, Section II (ripeness).

The only difference this time is that Berkeley adds two declarations from employees in the City Planning Office to prove that no CRA member has applied for an exemption from the natural gas ban. Berkeley appears to be suggesting that its challenge is now a "factual" attack on standing. But Berkeley's

---

[1] The Court expressed skepticism that there was any such requirement for a facial challenge, Hearing Tr. at 10:10-11, and suggested exemptions bear at most on ripeness, not standing, *id.* at 12:6-23. As the Court noted in denying early discovery, "Berkeley's prior and anticipated motions to dismiss are facial challenges to CRA's standing, where the jurisdictional challenge is confined to the allegations as pled in the complaint." Order Denying Discovery Letter Re: Early Discovery, ECF No. 45, at 2.

two declarations are not effective to raise a factual challenge, because they do not question the truth of the allegations necessary for the CRA to show standing to assert its claim. The two declarations address whether there is a CRA member who has applied for an exemption. But there is no allegation that a member of the CRA applied for an exemption, and none is required for standing to assert a facial challenge. The dispute is thus not about whether the CRA's allegations are *true*, but whether they are *legally sufficient* to show standing. That is the very definition of a facial jurisdictional attack: "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction," while in a factual challenge, the challenger "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A facial attack, such as the one Berkeley makes here, does not warrant consideration of evidence outside the complaint. Rather, "[t]he district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)," based on the allegations in the complaint. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014); *Am. Fed'n of Teachers v. Devos*, 2020 WL 5257561, at *5 (N.D. Cal. Sept. 3, 2020); *see also Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000). Berkeley's declarations thus should be excluded and are irrelevant. To the extent Berkeley's declarations have any bearing, however, they fail to refute standing because the CRA has submitted a declaration from the CRA's President and CEO as evidence in support of the allegations in the Amended Complaint. *See* Ex. B (Decl. of Jot Condie).[2]

## B. CRA Members Use Appliances Covered By The EPCA.

Berkeley also argues that the CRA does not have standing under the EPCA because (i) its members do not use consumer products, and (ii) its members do not "purchase" or "install" industrial products. Motion at 9-10. Berkeley's argument goes to the definitional scope of the EPCA on the merits

---

[2] The CRA believes Berkeley's argument is a facial jurisdictional challenge, which does not warrant consideration of evidence outside the complaint. Nonetheless, in an abundance of caution, the CRA offers Mr. Condie's declaration, affirming the facts in the complaint. Berkeley's two declarations do not rebut this evidence; they say only that Mr. Klein and Mr. Buckley "*have no knowledge* of any chef or restauranteur . . . seeking to open a restaurant in a newly constructed building" in Berkeley. ECF No. 47.19 ¶ 4 (emphasis added); ECF No. 47.21 ¶ 3. But their lack of knowledge does not prove no such restauranteur exists and, if sufficient, would open virtually every complaint to a "factual" challenge.

1  and involves questions of fact not properly resolved on a motion to dismiss.

2       The EPCA covers two different categories of appliances: <u>consumer</u> appliances and <u>industrial</u>

3  appliances. *See* 42 U.S.C. §§ 6291(2), 6292(a) (consumer products); 42 U.S.C. § 6311(2)(B) (industrial

4  products). For products like water heaters and furnaces that are on both lists, the statute defines whether

5  an appliance is a consumer product based on whether it is sold to individuals for personal use "to any

6  significant extent," regardless of whether a particular *unit* of the product has been purchased by an

7  individual or by a business. 42 U.S.C. § 6291(1). The Amended Complaint alleges that CRA members

8  use covered appliances in both categories. Am. Compl. ¶ 63. Specifically, it alleges that the CRA's

9  members "may buy or use the same types of water heaters, furnaces, space heating, stoves, and ovens that

10  are also sold to individuals" — i.e., consumer appliances. Am. Compl. ¶ 63, Ex. B, Condie Decl., ¶ 3.

11  And it alleges that the CRA's members "also purchase or use appliances that qualify as "industrial

12  equipment under the EPCA . . . [and] may use large-scale furnaces and water heaters that are regularly

13  sold for commercial or industrial (rather than consumer) use." *Id.* These allegations are sufficient to show

14  standing on a motion to dismiss.

15       i.   *Consumer Appliances*

16       Berkeley claims, first, that CRA members do not use "consumer products" under the EPCA

17  because restaurants may only use products classified as "commercial" under ANSI specifications.[3]

18  Motion at 9 (citing Cal. Health & Safety Code § 114301(d); ECF No. 47.20 ¶¶ 3-4). Berkeley's logic is

19  flawed. Berkeley assumes that an appliance designated "commercial" under ANSI standards is

20  necessarily an "industrial" appliance under the EPCA. Berkeley offers no evidence to prove the two

21  standards are the same. Equipment classified as "commercial" under the applicable ANSI standards —

22  and thus permissible for businesses, according to Berkeley — may be used by some consumers as well

23  and therefore still classified as a "consumer product" under the EPCA. 42 U.S.C. § 6291(1).[4]

24

25       [3] "ANSI is a private non-profit organization that oversees the development of voluntary consensus

26  standards for products, services, processes, systems, and personnel." *Nat'l Sur. Corp. v. India Tea &
Spices, Inc.*, 2012 WL 113608, at *2 n.1 (D. Mass. Jan. 12, 2012).

27       [4] Mr. Ogden declares only that ANSI classifies certain products as commercial and others as

28  consumer, and that his department has never "permitted the use of such appliances certified only for

In any event, this argument is not an appropriate basis for a motion to dismiss. It raises factual questions about the application of the ANSI standards, and merits questions about the interpretation of the EPCA. Berkeley's argument raises a barrage of disputed factual questions. Whether consumers, to any significant extent, use products classified as commercial under the ANSI standards necessarily raises questions about the types of products consumers regularly use — likely a disputed factual question that will require discovery. It also of course depends upon ANSI's specific requirements for commercial products in each category of EPCA-covered consumer products at issue in this case (including, for example, stoves, ovens, dishwashers, hot waters heaters, and furnaces), which is a factual question. Berkeley does not even include these ANSI standards as exhibits.

Berkeley's ANSI argument is also inappropriate at this stage because it is intertwined with the statutory scope of the EPCA on the merits and ought to be resolved through discovery and adjudicated at summary judgment or trial. "[A] jurisdictional finding of genuinely disputed facts is inappropriate when the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits of an action." *Safe Air for Everyone*, 373 F.3d at 1039 (quotations and alteration omitted). A plaintiff's ability "to allege a claim that comes within the definitional reach of" the governing statute "is a matter that goes to the merits of the action." *Sun Valley Gasoline, Inc. v. Ernst Enters., Inc.*, 711 F.2d 138, 140 (9th Cir. 1983). That type of question should not be resolved through extrinsic evidence at the motion to dismiss stage. *Safe Air for Everyone*, 373 F.3d at 1039; *see also Patel v. Facebook Inc.*, 290 F. Supp. 3d 948, 952 (N.D. Cal. 2018) (noting that a court's "discretion" to review factual allegations outside of the complaint "should be used with caution so that it does not usurp a merits determination"). Berkeley's argument here raises just such merits-type questions. Berkeley's extrinsic evidence purportedly contradicting the CRA's allegations on consumer products thus raises factual disputes and questions necessarily intertwined with the merits and should not be resolved on a motion to dismiss.

---

consumer use in a commercial kitchen" in Berkeley. ECF No. 47.20 ¶ 4. But Ogden does not say that appliances certified by ANSI for *commercial* use cannot be used by *consumers*. That is the actual question under the EPCA: if appliances that businesses may use under the ANSI standards are also used "to any significant extent" by consumers, they are consumer appliances under the EPCA.

ii.    *Industrial Appliances*

As to industrial appliances, Berkeley does not dispute the truth of the CRA's factual allegations that its members *use* such appliances, but instead argues only that the CRA's members must *purchase and install* industrial appliances in order to have standing and that the CRA cannot show this because restaurants "typically" rent a building with furnaces and water heaters already installed. *See* Motion at 9-10. What restaurants "typically" do is a factual matter outside the pleadings, and therefore outside the scope of a motion to dismiss. Further, the CRA's members need not purchase covered appliances to have standing. Even restaurants and chefs that rent spaces with appliances already installed are harmed by the Ordinance: they cannot rent new buildings with gas water heaters or furnaces because no landlord can build a new space and install such appliances under the Ordinance. The inability to use natural gas appliances is the alleged injury. That this injury is sufficient for standing is shown by cases where tenants are affected by regulations that directly apply only to property owners. *See Jensen v. Cty. of Sonoma*, 2010 WL 2330384, at *5 (N.D. Cal. June 4, 2010), aff'd, 444 F. App'x 156 (9th Cir. 2011) (finding no authority for the proposition a tenant may not challenge a land use regulation and noting "the indirectness of the injury does not necessarily deprive the person harmed of standing") (quotation omitted). .

**II.  THIS DISPUTE IS RIPE.**

Ripeness is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (9th Cir. 2000) (internal citation and quotation omitted); *see id.* at 1139 (noting ripeness is often treated under the rubric of standing, and "ripeness can be characterized as standing on a timeline"). Berkeley asserts mostly the same ripeness argument from its initial motion to dismiss, focusing on the availability of exemptions in the Ordinance and asserting that "there is a higher bar for establishing ripeness when a challenge to legislation is brought as a facial challenge." Motion at 10.

This gets it exactly backwards — facial challenges are almost always ripe. Berkeley relies for its assertion on *Pacific Legal Foundation v. State Energy Resources Conservation & Dev. Comm'n*, 659 F.2d 903, 915 (9th Cir. 1981), quoting the standard for as-applied challenges: if issues "would be illuminated by the development of a better factual record, the challenged statute or regulation is generally

not considered fit for adjudication until it has actually been applied." Motion at 10. But Berkeley neglects to quote the previous sentence that contains the correct standard for facial challenges: "*A challenge to a statute or regulation that has not yet been applied is generally considered fit for judicial determination if the issue raised is a purely legal one, or one which further factual development will not render more concrete.*" *Id.* (citations omitted) (emphasis added). Courts routinely recognize that facial challenges, where a plaintiff contends there is "no set of circumstances under which [the statute] would be valid," raise predominantly legal issues, do not require further factual development, and are "presumptively ripe." *United States v. Salerno*, 481 U.S. 739, 745 (1987); see also *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009); *see also Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, 2008 WL 5586316 (D.N.M. Oct. 3, 2008) (finding EPCA preemption challenge ripe where "[p]laintiffs are making a challenge to the facial validity of the Code and Ordinance, which are predominantly legal questions").[5]

The CRA raises a purely legal facial challenge to the Ordinance on preemption grounds, which does not require further factual development. *See Pac. Gas and Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) ("The question of preemption is predominantly legal[.]"); *City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1172 (9th Cir. 2001), overruled on other grounds by *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571 (9th Cir. 2008) (preemption is "a pure question of law" where "[n]o further factual record would narrow or clarify that issue"). And the CRA's Amended Complaint specifically alleges that "[t]here is no set of circumstances under which the Ordinance would be valid under state and federal law." Am. Compl. ¶ 16.

Berkeley nevertheless argues the CRA's claims are not ripe because no CRA member has sought an exemption under the Ordinance and any harm is thus "speculative." *See* Motion at 11-12. But "the question…is not…whether state and local law enforcement officials can *apply* the statute in a

_____

[5] *See also Roe No. 2 v. Ogden*, 253 F.3d 1225, 1232 (10th Cir. 2001); *NE Hub Partners, L.P. v. CNG Transmission Corp*., 239 F.3d 333, 345 (3d Cir. 2001); *United States v. Supreme Court of N.M.*, 980 F. Supp. 2d 1334, 1340-41 (D.N.M. 2013); *cf. L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (stating, in evaluating declaratory relief, that "[f]urther factual development will not assist our consideration of" a facial challenge where the "relevant facts are clear").

constitutional way….there can be no constitutional application of a statute that, on its face…is preempted by the Supremacy Clause." *United States v. Arizona*, 641 F.3d 339, 346 (9th Cir. 2011).[6] "[A] purely legal challenge to final agency action is not unfit for review merely because the application of the disputed rule remains within the agency's discretion." *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 854 (D.C. Cir. 2006) (internal citation omitted); *see also* Opp. to First MTD at 10-11 (listing supporting cases). Berkeley cites no authority to the contrary, and the only cases it cites concern as-applied challenges that depend on the specifics of how a law will be enforced. *See Clark v. City of Seattle*, 899 F.3d 802 (9th Cir. 2018) (claims depended on anticipated actions); *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 352-54 (2d Cir. 2005) (challenge to how a zoning ordinance was applied to a particular property).

Moreover, having to apply for an exemption from a preempted ordinance is itself a concrete injury: CRA members should not have to go through the time and expense of seeking narrow exemptions from an illegal statute in order to challenge it. "[U]ndergoing the [preempted state] process . . . is a hardship cognizable for preemption purposes, and thus for determining ripeness of [the] preemption claim[]." *City of Albuquerque*, 2008 WL 5586316, at *4 (collecting cases); *see also Algonquin Gas Transmission, LLC v. Town of Weymouth*, 365 F. Supp. 3d 147, 155 (D. Mass. 2019) (holding claim ripe because the court's decision on preemption would determine whether applying for the exemption was even necessary); *Pac. Gas and Elec. Co.*, 461 U.S. at 201 (challenge ripe because "preemption is predominantly legal" and there would be hardship in postponing resolution).

## III. AS A REGULATION CONCERNING ENERGY USE, THE ORDINANCE IS EXPRESSLY PREEMPTED BY THE EPCA.

Express preemption is a matter of statutory interpretation, focusing on the statute's text and additionally taking into account the purpose of the statute if need be. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 495-96. The analysis thus starts with the EPCA's express preemption provisions. For

---

[6] Berkeley's argument presupposes an ordinance could be preempted "as applied." But it is not clear "whether a federal law can preempt state law on an 'as applied' basis, that is, whether it is proper to find that federal law preempts a state regulatory scheme sometimes but not at other times[.]" *Cal. Tow Truck Ass'n v. City and Cty. of S.F.*, 693 F.3d 847, 865 (9th Cir. 2012).

consumer products, the EPCA states:

> effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product . . . .

42 U.S.C. § 6297(c).[7] That "plain language of the [EPCA] preemption statute makes clear that Congress intended the preemption to be broad in scope." *Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, 835 F. Supp. 2d 1133, 1136 (D.N.M. 2010) (Vázquez, C.J.).

Parsing the provision phrase by phrase, "energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." 42 U.S.C. § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3). And "'[c]oncerning' is generally defined in case law as 'relating to,'" which "express[es] a broad pre-emptive purpose." *City of Albuquerque*, 2008 WL 5586316, at *7 (quoting Black's Law Dictionary 289 (6th ed. 1990)). Thus, taking these provisions together, an ordinance is by default preempted if it relates to the quantity of electricity or fossil fuels directly consumed by a covered consumer product.

The next question, then, is what qualifies as a covered consumer product. The EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters," "furnaces," "dishwashers," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products. As discussed *supra*, p. 10, a product is a consumer product if it is "distributed in commerce for personal use or consumption by individuals" "to any significant extent." 42 U.S.C. § 6291(1).

Similarly, the EPCA governs the energy efficiency and energy use of certain <u>industrial</u> appliances. 42 U.S.C. §§ 6311-17. As with consumer products, the EPCA expressly preempts "any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A). "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at

---

[7] The term "State regulation" means "a law, regulation, or other requirement of a State or its political subdivisions" —i.e., local governments. 42 U.S.C. 6297(a)(2)(A).

the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards. *Id.* §§ 6311(7), 6291(3). Thus, regulations of industrial appliances are preempted if they concern the quantity of electricity or fossil fuels directly consumed by a covered industrial product.

The list of covered industrial products is slightly different than the list of covered consumer products. Among other things, the list includes "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. 42 U.S.C. § 6311(2)(B). Those products are "industrial" if they are "distributed in commerce for industrial or commercial use" to "any significant extent," and do not qualify as consumer products. 42 U.S.C. § 6311(2)(A).

A. **The Ordinance Concerns Energy Use Of EPCA-Covered Products.**

Ultimately, the application of both the consumer and industrial express preemption provisions collapses to the same key question: does the Berkeley Ordinance concern the quantity of electricity or fossil fuels consumed by an EPCA-covered product? If so, the Ordinance is expressly preempted.

Berkeley devotes only a single conclusory sentence to this pivotal issue, claiming that its Ordinance "does not in any way regulate . . . the amount of energy consumed" by EPCA-covered products. Motion at 14 (Section IV(B)(2)). That assertion does not make sense. Natural gas is a fossil fuel — it explicitly falls within the statutory definition of energy. The Ordinance concerns the quantity of natural gas consumed by appliances in the buildings it regulates — by barring the connection to gas pipes required to use natural gas, it requires that *no* natural gas is used. This prohibition necessarily affects all appliances in the buildings regulated by the Ordinance, including appliances covered by the EPCA (such as consumer water heaters, furnaces, dishwashers, and stoves/ovens, and industrial heating equipment, water heaters, and furnaces), because under the Ordinance, *no* appliance can connect to a gas line and use natural gas. Contrary to Berkeley's blanket assertion that it does not regulate "the amount of energy consumed," zero natural gas usage is an amount of natural gas usage. In other words, Berkeley is mandating that the quantity of natural gas consumed by EPCA-covered products is "none."

Berkeley suggests that the EPCA's express preemption provision cannot be interpreted so broadly, because the CRA's interpretation would ban all sorts of ordinary local regulations affecting EPCA-covered appliances. Berkeley presents a parade of horribles: what about regulations of nitrogen

oxide emissions? What about requiring walk-in freezers to have multiple exits for safety? *See* Motion at 18-20 (Section IV(B)(5)). But none of these regulations would be barred by the CRA's interpretation of the EPCA. The express preemption clause in the EPCA does not bar *all* local regulations that affect EPCA-covered appliances. It bars only local regulations that "concern[] energy use." Local regulations requiring extra exits in walk-in freezers or limiting the emissions of nitrous oxide may affect EPCA-covered appliances, but they do not "concern energy use."[8]

Berkeley's Ordinance, in contrast, concerns the energy used by appliances, because it ensures that appliances cannot use natural gas. Berkeley candidly admits that the intent and effect of the Ordinance is to "progressively eliminate natural gas connections from new buildings constructed in the City." Motion at 1. The sole, stated reason to eliminate those connections is to eliminate the natural gas appliances in those buildings. But in Berkeley's view, because the Ordinance nominally bans *connections to natural gas piping* rather than *natural gas appliances*, it is not preempted by the EPCA. This is a distinction without a difference. The EPCA was passed to prevent this exact risk of a proliferation of varying local laws setting different rules for appliance efficiency and energy use. Congress chose broad language for its express preemption clause, preempting any local regulations that "concern[]" energy use of covered products in any way. *See City of Albuquerque*, 2008 WL 5586316, at *7. Berkeley wants to do *exactly* what is prohibited by the EPCA; it cannot vitiate the EPCA's preemption provision simply by banning access to the energy source necessary for those appliances.[9]

In any event, at this stage, the CRA need only plead a plausible violation of the EPCA. To the extent there are disputes over the interpretation of the statute, the Court need not definitively resolve those disputes. Rather, the CRA's claims should advance if it has pled a violation of the statute under a

---

[8] Furthermore, as Berkeley points out, regulations that do concern energy use (like California's state energy efficiency standards) are permissible under the EPCA as long as they meet the requirements for the statutory exception to preemption. Motion at 15. The CRA's position does not imply that local governments can never regulate appliances, or even that they cannot regulate the energy used by those appliances. But a local government can only do so by complying with the EPCA's statutory requirements.

[9] That conclusion does not imply that all property must always have access to natural gas lines. The EPCA does not require that the market always support access to natural gas or natural gas appliances, but it does prevent cities from *barring* access by law to natural gas that would otherwise be available.

plausible interpretation. "[R]esolution of the scope of the statutory requirements and the parties' competing interpretations of the statutory provisions cited in the complaint is inappropriate on a motion to dismiss." *Ctr. for Food Safety v. Vilsack*, 2016 WL 4698901, at *7 (N.D. Cal. Sept. 8, 2016) (Gilliam, J.) (denying motion to dismiss because, despite disputes over the statutory requirements, "the complaint raises a plausible claim for relief"); *see also Follman v. Hosp. Plus of Carpentersville, Inc.*, 532 F. Supp. 2d 960, 963 (N.D. Ill. 2007); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 629 F. Supp. 2d 1123, 1128 (E.D. Cal. 2009). "[W]hile the precise meaning of the statute may remain to be determined," if the plaintiff's interpretation is plausible, the case should not be dismissed. *O'Dowd v. Anthem Health Plans, Inc.*, 2015 WL 5728814, at *6 (D. Colo. Sept. 30, 2015) (denying motion to dismiss where the defendant "cites no authority precluding [the plaintiff's] interpretation of the statute"); *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 117 (2015) (noting that the court "does not make a decision" about the ultimate statutory interpretation on a motion to dismiss). The CRA has at minimum stated a claim under a plausible interpretation of the EPCA's preemption provisions. That is enough at this stage of the litigation.

### B. The Structure of the EPCA Underscores The Preemption Of Berkeley's Ordinance.

The EPCA's structure underscores that Congress intended to broadly preempt state and local regulations, with only specific exemptions. *See Ret. Fund Tr. of Plumbing v. Franchise Tax Bd.*, 909 F.2d 1266, 1276 (9th Cir. 1990) (considering as an element of legislative history that Congress "intended [a statute's] preemptive scope to be broad and its exceptions to be narrow"); *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1061 (9th Cir. 2009) (same). The EPCA begins with a broad preemption of any "[s]tate regulation concerning the energy efficiency, energy use, or water use" of a covered product. *Id.* § 6297(c). It then offers specific exemptions to that broad preemption. *See* 42 U.S.C. §§ 6297(f)(3), 6316(2)(B). Congress carefully crafted the exemptions to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10-11 (1987). To fall within the exemptions, a building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the

credits provided for such energy efficiency" to assure even-handed regulation. *Id.*

The structure of the statutes shows that Congress did, indeed, intend to preempt a broad swath of local regulation concerning energy use, but then gives the local government room to legislate alternatives within their building codes so long as they comply with the requirements of the statutory exemptions. This shows how Congress intended to allow local governments a role in setting energy policy within the parameters set by the statutory exemptions.[10]

Berkeley's Ordinance does not meet Congress's strict requirements for the exception to preemption. As an initial matter, a local ordinance cannot qualify for the statutory exemption to preemption unless it is contained in a building code, which Berkeley's Ordinance admittedly is not. Am. Compl. ¶¶ 65, 71 (citing 42 U.S.C. §§ 6297(f)(3), 6316(2)(B)). Additionally, for a regulation concerning consumer appliances to avoid preemption, it must meet *all* of seven specific statutory requirements. For example, the first requirement is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). But the Ordinance does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that meet the objective; instead, the builder cannot select *any* appliances that use natural gas, because the building cannot connect to natural gas piping. *See* Am. Compl. ¶ 66. Similarly, the sixth requirement is that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy . . . ." 42 U.S.C. § 6297(f)(3)(F). But the Ordinance is not specified in terms of *total* consumption of energy, but instead allows all electric and bans all natural gas. *See* Am. Compl. ¶ 69. Several of the other seven requirements are likewise not met. *Id.* ¶¶ 67-68. Berkeley offers no argument on this point.

Berkeley's Ordinance is exactly the sort of regulation that the Ninth Circuit has emphasized does

---

[10] While the EPCA permits state and local governments to legislate within building codes (so long as the statutory requirements are met), California has circumscribed local governments' ability to regulate energy by imposing the reach code process. If the local government seeks to fit within the EPCA's statutory exemption, it must at least be in a building code; but then, once it regulates building and energy standards, the local government also must follow California's reach code amendment process. As discussed *infra*, Berkeley did not comply with the reach code law, and therefore its Ordinance is preempted by California law as well.

not fall within the EPCA's statutory exception to preemption. The Ninth Circuit has held that the exemption does not permit local regulations to "favor[] certain options over others" or to favor "particular products or methods." *Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1151, 1146 (9th Cir. 2012). In that case, Washington's regulations required an aggregate 15% reduction in new buildings' energy consumption. *Id.* at 1149. The state agency implementing the standard offered "different ways of achieving" it, including "by addressing the 'efficiency of a building's shell,' or 'efficiency of a home's heating equipment,' or 'efficiency of other energy consuming devices.'" *Id.* The Ninth Circuit concluded that those regulations were permissible because they only "require[d] builders to reduce a building's energy use by a certain amount," allowing the builder to "choose how to meet that requirement." *Id.* at 1145. But the court emphasized that the EPCA would bar a regulation "requir[ing] a builder, as a matter of law, to select a particular product or option." *Id.*; *see id.* at 1153. Berkeley's Ordinance falls on the wrong side of that line. In contrast to the Washington regulations, the Ordinance *requires* a builder to use certain options — electric appliances — rather than allowing the builder to choose how to accomplish a neutral aggregate energy objective. In short, the statutory structure reflects broad preemption. The limited exemptions to EPCA preemption were explicitly crafted to bar "unfairly weighted" local regulations and to ensure neutral "performance-based" goals.

C.  **The Legislative History Underscores Congress's Intent To Stop Local Governments From Adopting Inconsistent Rules For EPCA-Covered Appliances.**

The history of the EPCA demonstrates Congress's growing intent to preempt state and local regulations regarding appliance energy use. *See* Am. Compl. ¶¶ 36-48. As discussed *supra*, pp. 4-6, Congress has amended the EPCA several times, progressively moving away from a laissez faire approach towards binding federal energy standards. The original EPCA focused on labeling the energy efficiency of consumer appliances so that consumers could choose more efficient options. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499; *see supra* p. 4. But each subsequent amendment to the EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards. *See supra* pp. 4-6. Congress ultimately narrowed the path for a state to avoid preemption, purposefully making it "difficult" to "achiev[e] the waiver." S. Rep.

No. 100-6, at 2 (1987). Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11. Congress wanted to avoid state policies that were "unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.* at 11. Berkeley itself acknowledged the federal "approach to energy use in new buildings has largely been to mandate greater building efficiency and energy conservation." Am. Compl. ¶ 23.

Berkeley's only response to this legislative history is to say that it does not evince a desire to guarantee access to natural gas appliances in particular. *See* Motion at 20-22 (Section IV(B)(6)). While the legislative history does not refer to natural gas in particular, the Senate emphasized the need for "even-handed" standards that were not "unfairly weighted" to particular products. S. Rep. 100-6, at 10-11 (1987). The legislation was designed to avoid "the unavailability in the State of a product type or of products of a particular performance class," *id.* at 2, and to institute "performance-based codes" with energy objectives, *id.* at 10-11. Moreover, the broader intent of the statute was clearly to avoid a "patchwork" of regulations whereby an appliance would be legal in some localities but not others. Allowing individual cities to ban natural gas appliances would undercut these exact goals. Congress intended that such decisions be made at the federal level so that appliance manufacturers would be governed by one uniform set of standards.

Berkeley also argues that the Natural Gas Act ("NGA") was not intended to interfere with local government regulations of gas piping. *See* Motion at 17-18 (Section IV(B)(4)). But the CRA's claim is under the EPCA. The CRA argues that the EPCA — independent of the NGA — prohibits local regulations of natural gas piping when they concern the energy use of covered appliances. Contrary to Berkeley's assertions, the NGA does not specifically exempt from *all* federal regulation the local distribution of natural gas." Rather, the NGA says that "[t]he provisions of this chapter" — that is, the Natural Gas Act — "shall not apply . . . to the local distribution of natural gas." 15 U.S.C. § 717(b). The NGA does not say that *other federal laws* cannot preempt local regulations regarding the distribution of natural gas. The Ordinance is preempted by the EPCA, not because it concerns local natural gas access, but because it concerns the energy use of natural gas appliances.

### D. __The Exemptions In The Ordinance Have No Bearing On Express Preemption.__

Berkeley next argues that the exceptions in the Ordinance save it from preemption. Motion at 15 (Section IV(B)(3)). Berkeley's underlying logic seems to be that the Ordinance necessarily ensures compliance with state law (because it offers an exception if compliance with state law is not feasible); state law complies with federal law; and therefore the Ordinance also complies with federal law. But that conclusion does not follow. Even if Berkeley's exception guarantees compliance with state law, it does not guarantee compliance with federal law. If the City merely *adopted* state law, without any amendment, then it would make more sense to claim, as Berkeley does here, that the legitimacy of the city law rises or falls with state law. But that is not what Berkeley has done. Berkeley changed state law (and Berkeley failed to comply with state procedures for doing so, *infra* pp. 23-25) — and it therefore cannot shelter under the presumed validity of state law.

But in all events, compliance is not the issue: if the local law is a regulation concerning energy use of appliances, the EPCA directly applies to and preempts that local regulation, and the regulation must stand on its own footing. Thus, although it may be true that the California standards comply with federal law (although that is not at issue here), Berkeley's Ordinance adds a new restriction above and beyond California's standards that must be separately evaluated for compliance with federal law.

Further, Berkeley's argument addresses a hypothetical conflict preemption claim that the CRA has not even asserted. Berkeley's logic is that the Ordinance does not conflict with federal law. But that has no bearing on an express preemption claim: express preemption is based on statutory language, not an inquiry into whether the state and federal statutes conflict. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 946 (2016) (explaining that the "perceived difference . . . in the objectives" between state and federal law" does not shield" the state law from preemption). Here, the CRA is not asserting a conflict preemption claim — only an express preemption claim. *See* Am. Compl. ¶ 50.[11]

---

[11] Berkeley's argument that it is hard to prove conflict preemption in a facial challenge similarly is flawed. Motion at 16-17. The question for express preemption, under the EPCA, is whether the Ordinance concerns the energy use of covered appliances. No matter how it is *applied*, the Ordinance still concerns energy use and is preempted. Am. Compl. ¶ 4 ("There are no circumstances under which Berkeley's

**IV.  BERKELEY'S GAS BAN IS PREEMPTED BY STATE LAW.**

Berkeley largely reiterates its prior arguments on state law. The CRA hereby incorporates its prior briefing on these issues, Opp. to First MTD, ECF No. 22, 22-25, which it addresses only briefly here.

**A.  Berkeley's Ban Is An Invalid Exercise Of The Police Power And Is Preempted.**

The California Building Code provides for the adoption of statewide building standards, which are defined as any regulation "that specifically regulates, requires, or forbids the method of use, properties, performance, or types of materials used in the construction" of a building. HSC § 18909(a). California courts have held that this state law has fully occupied the field of building standards, and that, consequently, local governments may not use their general police powers to regulate in this area. *Building Ind. Ass'n v. City of Livermore*, 45 Cal. App. 4th 719, 726-27 (1996); *Briseno*, 6 Cal. App. 4th at 1381-83; *ABS Institute v. City of Lancaster*, 24 Cal. App. 4th 285, 293 (1994). The Berkeley Ordinance falls squarely within the definition of building standards — on its face, it "regulates" the "method of use, properties, performance, or types of materials used in the construction" of new buildings. *See* HSC § 18909(a). The Ordinance defines "Natural Gas Infrastructure" as "fuel gas piping. . . in or in connection with a building [or] structure." Ordinance § 12.80.030(E). Thus, Berkeley cannot rely on its police powers to adopt the Ordinance.

**B.  Berkeley's Ban Is Preempted By The California Building Code.**

If Berkeley seeks to modify state building standards, it must follow the statutory grant of authority for making such modifications — namely, the reach code process. *See* Am. Compl. ¶¶ 91-97; *Livermore*, 45 Cal. App. 4th at 725, 727. Specifically, state law requires that a city "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions" with the amendments "expressly marked and identified as to the applicable findings." *See* Cal. Code Reg. tit. 24, pt. 4, § 1.1.8.1; *id.* pt. 2.5, § 1.1.8.1*; id.* pt. 5, § 1.1.8.1; HSC § 17958.7. Berkeley does not seriously contest that it failed to identify its specific amendments or tie its local findings to each amendment; indeed, its subsequent reach code did so, illustrating by comparison that the Ordinance did not.

---

ordinance could be validly applied without violating EPCA; whether a permit application is granted or denied does not change the fact that the Ordinance's provisions violate the EPCA.").

Berkeley argues, first, that it did not need to comply with the amendment procedure because its Ordinance "does not repeal or amend" the Building Code, Motion at 24, and so there was nothing to identify. Berkeley's position rests on reading the statute's reference to "amendments, additions, or deletions" as excluding modifications; this position ignores the statutory language and the normal meaning of an "amendment" as any change or modification. *See* Am. Compl. ¶¶ 91-97.

Berkeley next argues that it *did comply* by filing the Ordinance with the Building Standards Commission, which "approved" the Ordinance. Motion at 23-24. Berkeley thus argues simultaneously that it made no amendments *and* that it complied with the requirements for amendments — which include identifying the very amendments that Berkeley denies exist. But filing the Ordinance cannot "cure" Berkeley's failure to follow the statutory requirements; this would vitiate the Building Code's amendment process. And this failure is not a mere technicality; those procedures provide notification to the public and state agencies of what changes to the state code are being contemplated and allow proper consideration and public debate. Moreover, the CBSC does not "approve" building standard modifications, and "may" reject a building standard only if no finding is submitted. Am. Compl. ¶ 93; HSC § 17958.7(b). Berkeley's failure to comply with the state requirements means the Ordinance is preempted and void.

## C. Berkeley's Ban Is Preempted By The California Energy Code.

Berkeley's Ordinance is also preempted by the California Energy Code. The Ordinance modifies a host of provisions of the Energy Code, including, for example, requirements for gas water heating systems, gas furnaces, and cooking appliance pilot lights. Am. Compl. ¶ 90. Such local modifications are preempted unless they follow a required statutory procedure and are approved by the CEC. *See supra* pp. 6-7; Am. Compl. ¶¶ 96-97; Cal. Pub. Res. Code § 25402.1(h)2; Cal. Code Reg. tit. 24, pt. 6, §§ 10-106, 10-110. Berkeley makes no pretense of having met any of the procedural requirements, nor has it submitted its ban to the CEC.

Berkeley argues that it did not have to comply with the state statutory procedure because "the Ordinance expressly disavows any intention to amend the Energy Code or to set standards regulating the use of appliances." Motion at 3; *see also* Ordinance at 2. Simply declaring that the Ordinance does not amend the Energy Code does not make it so. That the Ordinance applies to most, but not all, buildings

does not make it any less an amendment. In the same vein, ensuring the possibility of "compliance" with the Energy Code says nothing about whether the Ordinance *amends* the Energy Code. And that Berkeley may allow use of gas for "limited exemptions" is not the same as allowing use of gas as permitted by the Energy Code. Finally, whether a later ordinance is a reach code does not prove that this Ordinance is not.

Berkeley further relies for support on a non-binding opinion letter from the Executive Director of the Energy Commission, provided to Berkeley for purposes of this litigation. That letter purports to conclude that the Ordinance "'does not establish energy conservation, energy insulation, or energy efficiency standards' that are subject to the review by the Commission." Motion at 5. As an initial matter, this Court owes no deference to the letter's assertions. *See Yamaha Corp. of Am. v. State Bd. of Equalization*, 19 Cal. 4th 1, 11 (1998) ("[A]n interpretation of a statute contained in a regulation adopted after public notice and comment is more deserving of [judicial] deference than one contained in an advice letter prepared by a single staff member. . . .") (internal quotation and citation omitted); *see also Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003). The letter is contradicted by the CEC's own treatment of other natural gas bans, which it has reviewed and voted to approve. *See* Am. Compl. ¶ 97; CRA Opp. to RJN, filed herewith. In all events, this involves a complex statutory structure not suitable to resolve on a motion to dismiss.[12]

## **CONCLUSION**

For the above reasons, the Court should deny Berkeley's Motion to Dismiss.

---

[12] As Berkeley notes, under 28 U.S.C. § 1367(c), a district court *has discretion* to retain or dismiss state law claims when a federal cause of action is dismissed. *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc). The CRA understands that the Court has indicated it will not retain supplemental jurisdiction over the state law claims if it were to dismiss the federal claims. It is undisputed, however, that if the Court were to deny Berkeley's motion to dismiss the EPCA claim, it would be proper for the Court to retain supplemental jurisdiction over the state claims. Am. Compl. ¶ 19.

1

2　　Dated: October 13, 2020　　　　　　　　Respectfully submitted,

3　　　　　　　　　　　　　　　　　　　　**REICHMAN JORGENSEN LLP**

4　　　　　　　　　　　　　　　　　　　　*/s/ Courtland L. Reichman*

5　　　　　　　　　　　　　　　　　　　　Courtland L. Reichman (CA Bar No. 268873)
　　　　　　　　　　　　　　　　　　　　creichman@reichmanjorgensen.com
6　　　　　　　　　　　　　　　　　　　　Laura Carwile (CA Bar No. 291906)
　　　　　　　　　　　　　　　　　　　　lcarwile@reichmanjorgensen.com
7　　　　　　　　　　　　　　　　　　　　REICHMAN JORGENSEN LLP
　　　　　　　　　　　　　　　　　　　　100 Marine Parkway, Suite 300
8　　　　　　　　　　　　　　　　　　　　Redwood Shores, CA 94065
　　　　　　　　　　　　　　　　　　　　Telephone: (650) 623-1401
9　　　　　　　　　　　　　　　　　　　　Facsimile: (650) 623-1449

10

11　　　　　　　　　　　　　　　　　　　Sarah Jorgensen (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　sjorgensen@reichmanjorgensen.com
12　　　　　　　　　　　　　　　　　　　REICHMAN JORGENSEN LLP
　　　　　　　　　　　　　　　　　　　　1201 West Peachtree Street, Suite 2300
13　　　　　　　　　　　　　　　　　　　Atlanta, GA 30309
　　　　　　　　　　　　　　　　　　　　Telephone: (404) 609-1040
14　　　　　　　　　　　　　　　　　　　Facsimile: (650) 623-1449

15

16　　　　　　　　　　　　　　　　　　　Gary J. Toman (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　gtoman@wwhgd.com
17　　　　　　　　　　　　　　　　　　　WEINBERG, WHEELER, HUDGINS, GUNN &
　　　　　　　　　　　　　　　　　　　　DIAL LLP
18　　　　　　　　　　　　　　　　　　　3344 Peachtree Road NE, Suite 2400
　　　　　　　　　　　　　　　　　　　　Atlanta, GA 30326
19　　　　　　　　　　　　　　　　　　　Telephone: (404) 876-2700
　　　　　　　　　　　　　　　　　　　　Facsimile: (404) 875-9433
20

21　　　　　　　　　　　　　　　　　　　Kylie Chiseul Kim (*Pro Hac Vice*)
　　　　　　　　　　　　　　　　　　　　KELLOGG, HANSEN, TODD, EVANS, FIGEL &
22　　　　　　　　　　　　　　　　　　　FREDERICK LLP
　　　　　　　　　　　　　　　　　　　　1615 M St NW #400
23　　　　　　　　　　　　　　　　　　　Washington, DC 20036
　　　　　　　　　　　　　　　　　　　　Telephone: (202) 326-7924
24　　　　　　　　　　　　　　　　　　　Facsimile: (202) 326-7999

25

26　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiff*
　　　　　　　　　　　　　　　　　　　　*California Restaurant Association*
27

28