Lily N. Chinn (SBN 203173)
BAKER BOTTS L.L.P.
101 California Street Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6214
Fax: (415) 291-6314
Lily.chinn@bakerbottscom

Macey Reasoner Stokes (*Pro Hac Vice*)
BAKER BOTTS L.L.P.
910 Louisiana Street
Houston, Texas 77002
Telephone: (713) 229-1369
Fax: (713) 229-7869
Macey.stokes@bakerbotts.com

Megan Berge (*Pro Hac Vice*)
BAKER BOTTS L.L.P.
700 K Street, N.W.
Washington, D.C. 20001
Telephone: (202) 639-1308
Fax: (202) 639-1171
Megan.berge@bakerbotts.com

Francesca Eick (*Pro Hac Vice*)
BAKER BOTTS L.L.P.
98 San Jacinto Boulevard, Suite 1500
Austin, Texas 78701
Telephone: (512) 322-2672
Fax: (512) 322-3672
Francesca.eick@bakerbotts.com

*Attorneys for Proposed Amici Curiae*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| California Restaurant Association,<br><br>    Plaintiff,<br><br>v.<br><br>City of Berkeley,<br><br>    Defendant. | Case No. 4:19-CV-07668-YGR<br><br>**BRIEF OF AMICI CURIAE NATIONAL ASSOCIATION OF HOME BUILDERS; NATIONAL ASSOCIATION OF MANUFACTURERS; AIR CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE; HEARTH, PATIO, & BARBECUE ASSOCIATION** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................3

ARGUMENT ..............................................................................................................................4

     I.      The Act broadly and expressly preempts local and state ordinances that concern the energy use of covered products or equipment......................................4

     II.     The Berkeley Ordinance concerns energy use of covered products and is thus preempted.................................................................................................................8

     III.    If allowed to stand, the Berkeley Ordinance would thwart the spirit of the Act. ..10

CONCLUSION..........................................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Air Conditioning and Refrigeration Inst. v. Energy Res. Conservation and Dev. Comm'n*,
   410 F.3d 492 (9th Cir. 2005) ...................................................10

*Air Conditioning, Heating and Refrigeration Inst. v. City of Albuquerque*,
   835 F. Supp. 2d 1133 (D.N.M. 2010) ...........................................5

*Building Industrial Ass'n of Washington v. Washington State Building Code Council*,
   683 F.3d 1144 (9th Cir. 2012) ...................................................7

*In re Panang Grp. Co., Ltd.*,
   901 F.3d 1046 (9th Cir. 2018) ...................................................9

*Microsoft Corp. v. C.I.R.*,
   311 F.3d 1178 (9th Cir. 2002) ...................................................9

*Morrison v. Peterson*,
   809 F.3d 1059 (9th Cir. 2015) ...............................................4, 10

*Puente Arizona v. Arpaio*,
   821 F.3d 1098 (9th Cir. 2016) ...................................................6

*Sprint Telephony PCS, L.P. v. Cnty. of San Diego*,
   543 F.3d 571 (9th Cir. 2008) ...........................................4, 5, 6, 7

**STATUTES**

42 U.S.C. § 6201 *et seq.* ...............................................................1

42 U.S.C. § 6291(3) .....................................................................5

42 U.S.C. § 6291(4) ...............................................................3, 5, 8

42 U.S.C. § 6292 .........................................................................5

42 U.S.C. § 6295(o)(2)(B)(i) .........................................................11

42 U.S.C. § 6297(a)(2)(A) ..............................................................5

42 U.S.C. § 6297(c) .....................................................................5

42 U.S.C. § 6297(f)(3) ...............................................................5, 10

42 U.S.C. § 6311 ...................................................................................................................5

42 U.S.C. § 6311(4) ......................................................................................................3, 5, 8

42 U.S.C. § 6311(7) ...............................................................................................................5

42 U.S.C. § 6316(b)(2)(A) .....................................................................................................5

**OTHER AUTHORITIES**

H.R. Rep. No. 100-11 (1987) .................................................................................................3

S. Rep. No. 100-6 (1987) ...........................................................................................3, 7, 11

**INTEREST OF AMICI CURIAE**

Plaintiff California Restaurant Association ("Association") challenges the City of Berkeley's ("City") Natural Gas Infrastructure Ordinance ("Ordinance" or "Berkeley Ordinance") as preempted by the Energy Policy and Conservation Act ("Act"), 42 U.S.C. § 6201 *et seq*. Amici curiae are four national trade associations representing members in the building, building supply, and related trades who support smart policies that reduce greenhouse gas emissions. Amici curiae members manufacture, use, and rely on products and equipment regulated by the Act. Because the Berkeley Ordinance would prevent the use of certain products and equipment covered by the Act, this challenge is important to Amici and its resolution will impact their members. Below are separate interest statements from each amicus organization.

### National Association of Home Builders

The National Association of Home Builders ("NAHB") is a Washington, D.C.-based trade association whose mission is "to protect the American Dream of housing opportunities for all, while working to achieve professional success for its members who build communities, create jobs and strengthen our economy."[1] Founded in 1942, NAHB is a federation of more than 700 state and local associations. About one-third of NAHB's approximately 140,000 members are home builders or remodelers; its builder members construct about 80 percent of all new homes built in the United States. The remaining members are associates working in closely-related fields such as building products and services. NAHB's members collectively employ over 3.4 million people nationwide.

### National Association of Manufacturers

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states. Manufacturing employs more than 12 million men and women, contributes roughly $2.17 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for nearly three-quarters of private-sector research and development in the Nation. The NAM is the voice of the manufacturing community and the leading advocate for a policy agenda that helps

---

[1] NAHB's mission statement is available at https://www.nahb.org/Why-NAHB/About-NAHB (last visited November 13, 2020).

manufacturers compete in the global economy and create jobs across the United States.  The NAM is a 501(c)(6) nonprofit organization headquartered in Washington, D.C.

### Air Conditioning, Heating, and Refrigeration Institute

The Air Conditioning, Heating, and Refrigeration Institute ("AHRI") is a North American trade association of manufacturers of air conditioning, heating, and commercial refrigeration equipment.  AHRI aims to "be the advocate of North American HVACR and water heater manufacturers and a global leader of the industry."[2]  AHRI's 315 member companies manufacture quality, efficient, and innovative residential and commercial air conditioning, space heating, water heating, and commercial refrigeration equipment and components for sale in North America and around the world, accounting for more than 90 percent of HVACR and water heating residential and commercial equipment manufactured and sold in North America.

### Hearth, Patio & Barbecue Association

The Hearth, Patio & Barbecue Association ("HPBA") is the principal trade association representing the hearth products and barbecue industries in North America.  HPBA's members include manufacturers, retailers, distributors, manufacturers' representatives, service installation firms, and other companies and individuals who have business interests related to the hearth, patio, and barbecue industries.

---

[2] AHRI's mission statement is available at http://www.ahrinet.org/about-us (last visited November 13, 2020).

**INTRODUCTION AND SUMMARY OF ARGUMENT**

The question before this Court is whether the Berkeley Ordinance is a regulation "concerning" the "energy efficiency" or "energy use" of a covered product under the Act. The answer to that question is unequivocally yes. The City attempts to shift the Court's focus by arguing that the Ordinance is not preempted because it regulates the installation of natural gas infrastructure and does not directly or expressly regulate the "energy efficiency" or "energy use" of a covered product. Motion to Dismiss First Amended Complaint at 2, 14. But the City's myopic argument has no basis in either the Act, which broadly preempts any ordinance "concerning" the energy use of covered products, or the Ordinance, which necessarily concerns the energy use of covered products. The Act defines "energy use" as "the quantity of [electricity, or fossil fuels] directly consumed" by covered products or industrial equipment "at the point of use." 42 U.S.C. §§ 6291(4); 6311(4). By banning the installation of natural gas connections in new construction, the Ordinance necessarily ensures that the amount of fossil fuels consumed by a subset of covered products—gas appliances—is driven to zero. The Ordinance therefore concerns the energy use of covered products and, as such, is expressly preempted by the Act.

The City's truncated description of the Ordinance's effects notwithstanding, the Ordinance has far-reaching consequences—especially for Amici who are in the building, building supply, and related trades. The Act's preemption provisions were enacted, in part, to "reduce the regulatory and economic burdens on the appliance manufacturing industry" and to "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." *See* S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987). The Berkeley Ordinance effectively prohibits use of a whole subset of covered products within the City. Allowing the Ordinance to survive preemption would thus create exactly the type of regulatory patchwork Congress intended to avoid, especially given that many cities and municipalities have now followed in the City's footsteps to adopt similar

BRIEF OF AMICI CURIAE
CASE NO. 4:19-CV-07668-YGR

ordinances of their own.

And while the Association's members are understandably most concerned about the use of gas cooking appliances, Amici represent members who manufacture, sell, install, and use myriad types of gas appliances, including dual fuel heat pumps, water heaters, boilers, and furnaces—most, but not all, of which are federally covered products under the Act. Prohibiting the use of these appliances constricts the livelihoods of Amici's members—a devastating consequence for the many members who are small and independently owned businesses. Accordingly, Amici respectfully urge the Court to deny the City's Motion to Dismiss.

## ARGUMENT

I.    **The Act broadly and expressly preempts local and state ordinances that concern the energy use of covered products or equipment.**

To decide the Association's claim challenging the Ordinance as preempted, the Court need look no further than the plain language of the Act's express preemption provisions. The parties agree that the Association has asserted a facial challenge to the Berkeley Ordinance.[3] Motion to Dismiss First Amended Complaint at 5; Opposition to Motion to Dismiss First Amended Complaint at 13. In cases where the challenger argues a local or state law is facially invalid because it is preempted by federal law, the court must first look to the specific preemption language at issue. *See, e.g. Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 575-79 (9th Cir. 2008) (beginning analysis by analyzing the preemption provisions at issue and noting that "Sprint's suit hinges on [that] statutory text"). The Act contains two preemption provisions: one for consumer products, and one for commercial and industrial products and equipment. Both expressly preempt local ordinances, such as the Berkeley Ordinance, that concern the energy use of covered product or industrial equipment.

The express preemption provision in the Act's consumer standards states that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be

---

[3] A facial challenge asserts that the challenged law is unlawful "in all its applications." *Morrison v. Peterson*, 809 F.3d 1059, 1064 (9th Cir. 2015) (citation omitted). The challenger "must establish that no set of circumstances exists under which the Act would be valid." *Id.* (citation omitted).

effective with respect to such product" unless the regulation falls within certain enumerated conditions.[4]   42 U.S.C. § 6297(c).   The express preemption provision in the Act's commercial standards similarly states that it "supercede[s] any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute.   *Id.* § 6316(b)(2)(A).   For consumer products, "energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use."   *Id.* § 6291(4).   For commercial and industrial standards, "energy use" is likewise defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use."   *Id.* § 6311(4).   For all standards, "energy" is defined as "electricity, or fossil fuels."   *Id.* §§ 6311(7), 6291(3).   Covered products and equipment are listed in 42 U.S.C. §§ 6292, 6311 and include dual fuel heat pumps, water heaters, boilers, and furnaces, among other appliances.   The Act also contains an express exception from preemption for regulations that are (1) contained in the state or locality's building code and (2) meet all of the seven conditions codified in 42 U.S.C. § 6297(f)(3).

"The plain language of the [Act's] preemption statute makes clear that Congress intended the preemption to be broad in scope."   *Air Conditioning, Heating and Refrigeration Inst. v. City of Albuquerque*, 835 F. Supp. 2d 1133, 1136 (D.N.M. 2010).   In particular, "the use of the word 'concerning' suggests that Congress intended the preemption provision to be expansive."   *Id.* (citation omitted).   The Oxford English Dictionary defines "concerning" as "[t]o refer to or relate to; to be about."[5]   The inclusion of this broad term confirms that the Act does not require that a local or state ordinance directly "regulate" the energy use of covered products or equipment to be preempted.   Nor does it require that a local or state ordinance expressly ban covered products or equipment to be preempted.

The expansiveness of this preemption language is underscored by contrasting it with the narrow preemption language at issue in *Sprint Telephony PCS, L.P. v. City of San Diego*, which the City cites as "illustrative of the unique burdens imposed on facial challenges."   Motion to Dismiss

---

[4] Under 42 U.S.C. § 6297(a)(2)(A), the definition of "State regulation" includes laws, regulations, or other requirements of States *and* their political subdivisions.
[5] OXFORD ENGLISH DICTIONARY, *Concern* (Nov. 13, 2020)
https://www.oed.com/view/Entry/38153?rskey=D6AeEH&result=1&isAdvanced=false#eid

BRIEF OF AMICI CURIAE
CASE NO. 4:19-CV-07668-YGR

First Amended Complaint at 23 (internal quotations omitted).  *Sprint,* however, is easily distinguished, and in fact strengthens the conclusion that the Act's preemption provisions are comprehensive in scope.

*First,* the preemption challenge in *Sprint* arose under a statute that has a much narrower preemption provision than the Act's preemption provision.  In *Sprint*, a wireless services provider asserted that a county ordinance was preempted by the federal Telecommunications Act.  543 F.3d at 573.  The relevant preemption provision provided that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *Id.* at 576.  Under a plain reading of this provision, a local ordinance would only be preempted if it *prohibits or effectively prohibits* the provision of wireless services.  By contrast, a local ordinance is preempted under the Act if it merely *concerns* the energy use of covered products or equipment—no prohibition, effective or otherwise, is necessary.[6]

*Second,* in *Sprint,* the challenged ordinance merely established "guidelines for the placement, design and processing of wireless telecommunications facilities in all zones with the County of San Diego." *Id.* at 574.  The *Sprint* Court held that this ordinance was not preempted by the Telecommunication Act's narrow preemption provision because it was not "an outright ban on wireless facilities" and did not "effectively prohibit[] the provision of wireless facilities." *Id.* at 579.  The ordinance only imposed additional siting and design requirements for wireless facilities, which the challenger could not demonstrate would effectively prohibit its provision of wireless services. *Id.* at 574, 579-80.

*Third,* *Sprint* does not support the City's argument that "the availability of a discretionary

---

[6] Berkeley also cites *Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016), as an example of a court considering federal preemption in a facial challenge.  However, *Puente* did not involve an express preemption provision.  An immigrant advocacy group challenged Arizona laws prohibiting the use of a false identity to obtain employment.  The group "argued that the federal Immigration Reform and Control Act established a 'comprehensive framework' for regulating the employment of unauthorized aliens and, therefore Arizona's employment-related identity theft laws were facially preempted." *Id.* at 1102.  The challenger in *Puente* was thus asking the court to find field preemption, which is a much harder task to demonstrate than express preemption.  *Id.* at 1102-04.

BRIEF OF AMICI CURIAE
CASE NO. 4:19-CV-07668-YGR

permitting process" in an ordinance defeats a facial preemption claim.  Motion to Dismiss First Amended Complaint at 16.  This argument fails to account for the actual text of the Act's preemption provisions: the Act preempts a local ordinance that *concerns* the energy use of covered products and equipment—categorically and regardless of any discretionary exemptions to the application of the ordinance.  The existence of exemptions could change whether a local ordinance would *prohibit* an action in every circumstance, as in *Sprint*.  But it cannot change whether an ordinance *concerns* the energy use of covered products and is therefore preempted.  Stated differently, there is no set of circumstances in which a local ordinance that concerns the energy use of covered products and equipment is not preempted by the Act without satisfying the statutory criteria to qualify for one of the Act's preemption exceptions.

Nor does *Building Industry Ass'n of Washington v. Washington State Building Code Council*, 683 F.3d 1144 (9th Cir. 2012) support the City's argument, as it is not an example of a court "rejecting [an] express EPCA preemption claim."  Motion to Dismiss First Amended Complaint at 13.  Indeed, the *Building Industry Ass'n of Washington* Court recognized that the Act contains an express preemption provision but nonetheless held that Washington met the specifically enumerated criteria to qualify for the preemption exception.  *Bldg. Indus. Ass'n of Wash.*, 683 F.3d at 1145.  The Act's legislative history indicates that under this exception, Congress intended "achieving the waiver [to be] difficult" and that waiver of the Act's preemption provision should not be granted if the "State regulation is likely to result in the unavailability in the States of a product type or of products of a particular performance class."  S. Rep. No. 100-6, at 2 (1987).  The fact that the Act contains a safe harbor provision that is so difficult to meet underscores, again, just how broad Congress intended the express preemption to be.  Indeed, there would be no need for such a safe harbor provision if Congress did not intend for the Act's preemption to be expansive.

In sum, the plain language of the Act preempts any state or local regulation *concerning* the energy use of a covered product, and this Court should reject any attempt to reframe the statutory language to say otherwise.

**II.      The Berkeley Ordinance concerns energy use of covered products and is thus preempted.**

The Act preempts the Berkeley Ordinance because the Ordinance concerns the energy use of covered products and equipment.  Signed into law on August 6, 2019, the Ordinance amends Title 12 of Berkeley Municipal Code, adding "Natural Gas Infrastructure shall be prohibited in Newly Constructed Buildings" effective January 1, 2020.  The Ordinance defines Natural Gas Infrastructure as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending from the point of delivery at the gas meter."

On its face, the Ordinance expressly prohibits natural gas infrastructure in new buildings.  But by doing so, it necessarily and inexorably also prohibits the energy use (i.e., fossil fuel use) of covered products in new buildings.  That is, because the Ordinance prohibits new gas hookups, it necessarily reduces the quantity of natural gas consumed by covered products to zero.  If there are no gas hookups, there can be no use of gas appliances.  Thus, the Ordinance concerns not only natural gas infrastructure, but also the energy use of covered products.

Importantly, the City does not dispute that the Berkeley Ordinance will impact the quantity of natural gas ("fossil fuel") used by covered products and equipment where it applies.  *See* 42 U.S.C. §§ 6291(4); 6311(4) (energy use is "the quantity of [electricity, or fossil fuels] directly consumed" by covered products or industrial equipment "at the point of use.")  Instead, the City argues that its Ordinance only regulates natural gas infrastructure, not covered products and equipment.  Motion to Dismiss First Amended Complaint at 14.  The City essentially argues that the Ordinance would have to directly or expressly regulate covered products and equipment for the Act to preempt it.  Not so. The Act does not state that a regulation is preempted only if it directly or expressly regulates the energy use of covered products and equipment.  Instead, it broadly states that a regulation is preempted if it *concerns* the energy use of covered products and equipment and should not be interpreted to mean

otherwise.  *See Microsoft Corp. v. C.I.R.*, 311 F.3d 1178, 1186 (9th Cir. 2002) (internal quotations omitted) (it is well settled that courts "may not add terms or provisions where Congress has omitted them").

If Congress had intended the Act to preempt only state and local ordinances that directly and expressly regulate the energy use of covered products and equipment, it would have said so.[7]  The City's interpretation would not only require the Court to depart from the statutory text, but it would also enable a major end run around the Act's preemption provisions.  A state or local government desiring to ban or otherwise affect the energy use of covered products could escape preemption simply by carefully avoiding express language.  That result would directly conflict with legislative intent as reflected by the preemption statutes' recognized broad scope.

The City also argues that the Ordinance survives preemption because it contains two exceptions that allow for a "discretionary permitting process that provides the ability to ensure compliance with federal law."  Motion to Dismiss First Amended Complaint at 4, 17.  Whether the Berkeley Ordinance has exceptions and whether the Associations' members could meet the exceptions are irrelevant to the Court's analysis of whether the Ordinance is preempted.  The Ordinance concerns energy use regardless of whether it has exceptions and irrespective of whether Association members could meet those exceptions.  Under the Act, the Berkeley Ordinance does not need to prohibit the energy use of covered products to be preempted in all circumstances; it merely has to *concern* the energy use of covered products, which it does.

Because the Berkeley Ordinance falls squarely within the Act's express preemption provisions and the City does not contend that the Ordinance falls within the Act's narrow safe harbor from

---

[7] "The first and most important canon of statutory construction is the presumption 'that a legislature says in a statute what it means and means in a statute what it says there.'"  *In re Panang Grp. Co., Ltd.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (citation omitted).

preemption,[8] there are no circumstances under which the Ordinance would be valid.  The Association's facial challenge should therefore prevail.  *See Morrison v. Peterson*, 809 F.3d 1059, 1064 (9th Cir. 2015) (To successfully mount a facial challenge, the challenger "must establish that no set of circumstances exists under which the Act would be valid.").

### III.    If allowed to stand, the Berkeley Ordinance would thwart the spirit of the Act.

Since the City enacted the Berkeley Ordinance, other gas bans have been introduced or enacted throughout the country.  These gas bans are local, typically applying to one town or city.  Over thirty municipalities in California have enacted some variance of a gas ban, and over fifty cities and counties across the country are considering policies to compel all-electric new construction.[9]  If this continues, whether an appliance manufacturer or home builder could supply or use a certain appliance may differ from city to city, and even within a city—an especially daunting prospect to small and independently owned business. Allowing the Berkeley Ordinance to stand will lead to exactly the type of regulatory patchwork that the Act is intended to avoid.

Key to achieving Congress's intent to create a nationwide comprehensive energy policy was vesting in the Department of Energy ("DOE"), not municipalities, the authority to make critical decisions about energy use and efficiency of covered products and equipment.  Congress passed the Act to create a "comprehensive energy policy" and address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources," in response to the oil crisis faced by the United States in the early 1970s.  *Air Conditioning and Refrigeration Inst. v. Energy Res. Conservation and Dev. Comm'n,* 410 F.3d 492, 498 (9th Cir. 2005).  As originally

---

[8] The City has not argued that the Ordinance falls within the exception to the preemption provisions set forth in 42 U.S.C. § 6297(f)(3), nor could it.  This narrow safe harbor provision only applies to regulations contained in building codes; the Berkeley Ordinance is contained in Title 12 of the Berkeley Municipal Code, which governs "Health and Safety."  In addition, the City does not allege that the Ordinance meets one of the seven enumerated conditions set forth in Section 6297(f)(3).
[9] Matt Gough, *California's Cities Lead the Way to a Gas-Free Future*, Sierra Club (Oct. 7, 2020) https://www.sierraclub.org/articles/2020/10/californias-cities-lead-way-gas-free-future

BRIEF OF AMICI CURIAE
CASE NO. 4:19-CV-07668-YGR

enacted, the Act permitted significant state involvement in appliance regulation.  *Id.* at 499.  However, in 1987, Congress amended the Act to add the preemption provisions.  The purpose of the amendment was to "reduce the regulatory and economic burdens on the appliance manufacturing industry" and to protect the appliance manufacturing industry from "a growing patchwork of differing State regulations which would increasingly complicate their design, production, and marketing plans."  *See* S. Rep. No. 100-6, at 1, 4 (1987).

In executing its responsibility to establish energy standards, the DOE conducts an incredibly complex analysis of factors that a municipality is unequipped and unable to perform.  Such a complex inquiry is necessary for the development of smart policies that reduce greenhouse gas emissions.  For example, the DOE must determine whether a standard is economically justified and in doing so must consider: "the economic impacts of the standard on the manufacturers and on the consumers of the products subject to such standard;" "the savings in operating costs throughout the estimated average life of the covered product in the type (or class) compared to any increase in the price of, or in the initial charges for, or maintenance expenses of, the covered products which are likely to result from the imposition of the standard;" "the total projected amount of energy . . . savings likely to result directly from the imposition of the standard;" "any lessening of the utility or the performance of the covered products likely to result from the imposition of the standard;" "the impact of any lessening of competition, as determined in writing by the Attorney General, that is likely to result from the imposition of the standard; "the need for national energy . . . conservation;" and any "other factors the Secretary considers relevant."  42 U.S.C. § 6295(o)(2)(B)(i).

The City has neither evaluated nor made a determination on these issues and cannot make them on the requisite national scale.  Nor is it meant to.  The Act makes clear that these kinds of determinations, with far-reaching impacts, are to be made on the federal level so that there can be a comprehensive, nationwide policy that considers more than just one municipality's aims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Allowing the City to interfere with this national "comprehensive energy policy" will have consequences extending beyond natural gas infrastructure.  For example, if allowed to stand, the Berkeley Ordinance will significantly impact the City's market for tankless water heaters.  Tankless water heaters are predominately gas powered and high-efficiency,[10] and the City's gas ban will cap the market to existing sites and greatly impact the retrofit market.  California is a strong market for tankless water heaters, and if bans similar to the Berkeley Ordinance were applied piecemeal within the state—which has already started happening—it would have a significant impact on the market for this product and induce installers to stop carrying it.  Such a result would adversely affect businesses that manufacture, stores that supply, and individuals that install tankless water heaters.  Further, it would reduce consumer choice and force consumers to use less effective or less energy efficient products.  Tankless water heaters are just one example—among many—of how the Ordinance could impact markets for covered appliances.

The Act's preemption provisions exist precisely to ensure that the DOE can make decisions that balance the benefits and burdens of efficiency standards, rather than allowing localities to make decisions that could have unintended market consequences.

## CONCLUSION

For the foregoing reasons, Amici respectfully urge the Court to deny Berkeley's Motion to Dismiss.

---

[10] Tankless water heaters are also called "instantaneous water heaters."  Electric-powered tankless water heaters exist, but they are typically very small (point-of-use/under sink sized; less than 2.6 gallons per minute).  Virtually all whole-home instantaneous water heaters are gas-powered because it requires too much electricity to heat water at the requisite rate.  *See* AHRI Directory of Certified Performance at www.AHRIDirectory.org.

1    Dated: November 13, 2020

2

3                                        By: /s/Lily Chinn
                                             Lily Chinn
4                                            BAKER BOTTS L.L.P.
                                             101 California Street, Suite 3600
5                                            San Francisco, California 94111
                                             Telephone: (415) 291-6214
6                                            Fax: (415) 291-6314
                                             Lily.chinn@bakerbotts.com
7
                                             Megan Berge (*Pro Hac Vice*)
8                                            BAKER BOTTS L.L.P.
                                             700 K Street, N.W.
9                                            Washington D.C. 20001
                                             Telephone: (202) 639-1308
10                                           Fax: (202) 639-1171
                                             Megan.berge@bakerbotts.com
11
                                             Macey Reasoner Stokes (*Pro Hac Vice*)
12                                           BAKER BOTTS L.L.P.
                                             910 Louisiana Street
13                                           Houston, Texas 77002
                                             Telephone: (713) 229-1369
14                                           Fax: (713) 229-7869
                                             Macey.stokes@bakerbotts.com
15
                                             Francesca Eick (*Pro Hac Vice*)
16                                           BAKER BOTTS L.L.P.
                                             98 San Jacinto Boulevard Suit 1500
17                                           Austin, Texas 78701
                                             Telephone: (512) 322-2672
18                                           Fax: (512) 322-3672
                                             Francesca.eick@bakerbotts.com
19
20                                           *Attorneys for Amici Curiae*

21

22

23

24

25

26

27

28
                                       13                    BRIEF OF AMICI CURIAE
                                                             CASE NO. 4:19-CV-07668-YGR

**CERTIFICATE OF SERVICE**

I certify that on November 13, 2020, I caused this document, the accompanying Brief, and Proposed Order, to be filed via the U.S. District Court for the Northern District of California's CM/ECF, which I understand caused service on all registered parties.


/s/ Lily Chinn
Lily Chinn (SBN 203173)

BRIEF OF AMICI CURIAE
CASE NO. 4:19-CV-07668-YGR