**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation, | No. 21-16278 |
| | D.C. No. 4:19-cv-07668-YGR |
| *Plaintiff-Appellant,* | |
| v. | |
| | OPINION |
| CITY OF BERKELEY, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Northern District of California
Yvonne Gonzalez Rogers, District Judge, Presiding

Argued and Submitted May 12, 2022
San Francisco, California

Filed April 17, 2023

Before: Diarmuid F. O'Scannlain and Patrick J. Bumatay,
Circuit Judges, and M. Miller Baker,* Judge.

---

* The Honorable M. Miller Baker, Judge for the United States Court of
International Trade, sitting by designation.

Opinion by Judge Bumatay;
Concurrence by Judge O'Scannlain;
Concurrence by Judge Baker

## SUMMARY[**]

### Energy Law / Preemption

The panel reversed the district court's dismissal of the California Restaurant Association's action alleging that the Energy Policy and Conservation Act preempts a City of Berkeley regulation that prohibits the installation of natural gas piping within newly constructed buildings.

The panel held that the California Restaurant Association, whose members include restaurateurs and chefs, had Article III associational standing to bring this suit because it demonstrated that (1) at least one of its members had suffered an injury in fact that was (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; (2) the injury was fairly traceable to the challenged action; and (3) it was likely, not merely speculative, that the injury would be redressed by a favorable decision. Specifically, the Association established that the ordinance would imminently harm its members because it alleged that its members would open or relocate a restaurant in Berkeley but for the city's ban on natural gas piping.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the Energy Policy and Conservation Act preempts the Berkeley ordinance.  The panel wrote that, in this express preemption case, it addressed the plain meaning of the Act without any presumptive thumb on the scale for or against preemption.  The Act expressly preempts State and local regulations concerning the energy use of many natural gas appliances, including those used in household and restaurant kitchens.  Instead of directly banning those appliances in new buildings, Berkeley took a more circuitous route to the same result and enacted a building code that prohibits natural gas *piping* into those buildings, rendering the gas appliances useless.  The panel held that, by its plain text and structure, the Act's preemption provision encompasses building codes that regulate natural gas *use* by covered products.  By preventing such appliances from *using* natural gas, the Berkeley building code did exactly that.  The panel reversed and remanded for further proceedings.

Concurring, Judge O'Scannlain wrote that he agreed that the Energy Policy and Conservation Act preempts the Berkeley ordinance, but he only reached that conclusion because, under Ninth Circuit precedent, he was bound to hold that the presumption against preemption does not apply to the express-preemption provision at issue.  Judge O'Scannlain wrote, however, that the law regarding the presumption against preemption in express-preemption cases is troubling and confused—beset by tensions in Supreme Court precedents, disagreement among the circuits, and important practical questions still unanswered.

Concurring, Judge Baker stated that he wrote separately to express his reservations about the Association's standing and to explain his understanding of why the City of Berkeley's ordinance invades the core area preempted by the

Energy Policy and Conservation Act.  Judge Baker wrote that, at the pleading stage, an organization need not identify any specific injured member in order to establish associational standing, but it must do so at summary judgment or trial.  As to preemption, Judge Baker wrote that the Berkeley ordinance cut to the heart of what Congress sought to prevent—state and local manipulation of building codes for new construction to regulate the natural gas consumption of covered products when gas service is otherwise available to the premises where such products are used.  Judge Baker therefore joined the panel opinion in full.

## COUNSEL

Brian C. Baran (argued), Courtland L. Reichman, Laura Carwile, and Ariel C. Green Anaba, Reichman Jorgensen Lehman & Feldberg LLP, Redwood Shores, California; Sarah Jorgensen, Reichman Jorgensen Lehman & Feldberg LLP, Atlanta, Georgia; Kylie Chiseul Kim, Kellogg Hansen Todd Figel & Frederick PLLC, Washington, D.C.; Gary J. Toman, Weinberg Wheeler Hudgins Gunn & Dial, Atlanta, Georgia; for Plaintiff-Appellant.

Anthony L. Francois (argued) and Peter S. Prows, Briscoe Ivester & Bazel LLP, San Francisco, California; Farima Faiz Brown and Brendan Darrow, Deputy City Attorneys; Office of the City Attorney; Berkeley, California; for Defendant-Appellee.

Thomas G. Pulham (argued), Michael S. Raab, and H. Thomas Byron III, Appellate Staff Attorneys; Stephanie Hinds, Acting United States Attorney; Brian M. Boynton,

Acting Assistant Attorney General; United States Department of Justice; Washington, D.C.; Emily Hammond, Deputy General Counsel for Litigation Regulation and Enforcement; Samuel T. Walsh, General Counsel; Department of Energy; Washington, D.C.; for Amicus Curiae United States of America.

Michael L. Murray and Matthew J. Agen, American Gas Association, Washington, D.C., for Amicus Curiae American Gas Association.

Megan H. Berge, Baker Botts LLP, San Francisco, California; Francesca Eick, Baker Botts LLP, Austin, Texas; JoAnna Adkisson, Baker Botts LLP, Washington, D.C.; for Amici Curiae Air Conditioning Heating and Refrigeration Institute; California Building Industry Association, Hearth Patio & Barbecue Association; National Association of Home Builders, and National Association of Manufacturers.

Michael Burger, Jennifer Danis, and Amy E. Turner, Sabin Center for Climate Change Law, New York, New York, for Amici Curiae National League of Cities, League of California Cities, and California State Association of Counties.

Somerset Perry, M. Elaine Meckenstock, Jonathan A. Wiener, and Theodore A. McCombs, Deputy Attorneys General; Myung J. Park and David A. Zonana, Supervising Deputy Attorneys General; Robert W. Byrne and Edward H. Ochoa, Senior Assistant Attorneys General; Rob Bonta, Attorney General of California; Office of the California Attorney General; San Diego, California; for Amici Curiae the States of California, Maryland, New Jersey, New Mexico, New York, Oregon, and Washington, the

Commonwealth of Massachusetts, the District of Columbia, and the City of New York.

Regina J. Hsu, Earthjustice, San Francisco, California; Timothy R. Oberleiton, Earthjustice, Washington, D.C.; for Amici Curiae Climate Health Now and San Francisco Bay Physicians for Social Responsibility.

Daniel N. Carpenter-Gold, Cara A. Horowitz, and Julia E. Stein, UCLA Law School Frank G. Wells Environmental Law Clinic, Los Angeles, California, for Amici Curiae Energy and Environmental Law Professors.

Kimberly E. Leefatt, Natural Resources Defense Council, Santa Monica, California; Thomas Zimpleman, Natural Resources Defense Council, Washington, D.C.; for Amici Curiae Chef Christopher Galarza and Ched Gerard Kenny II.

**OPINION**

BUMATAY, Circuit Judge:

By completely prohibiting the installation of natural gas piping within newly constructed buildings, the City of Berkeley has waded into a domain preempted by Congress. The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6297(c), expressly preempts State and local regulations concerning the energy use of many natural gas appliances, including those used in household and restaurant kitchens.  Instead of directly banning those appliances in new buildings, Berkeley took a more circuitous route to the same result.  It enacted a building code that prohibits natural gas *piping* into those buildings, rendering the gas appliances useless.

The California Restaurant Association, whose members include restaurateurs and chefs, challenged Berkeley's regulation, raising an EPCA preemption claim.  The district court dismissed the suit.  In doing so, it limited the Act's preemptive scope to ordinances that facially or directly regulate covered appliances.  But such limits do not appear in EPCA's text.  By its plain text and structure, EPCA's preemption provision encompasses building codes that regulate natural gas *use* by covered products. And by preventing such appliances from *using* natural gas, the new Berkeley building code does exactly that.

We thus conclude that EPCA preempts Berkeley's building code's effect against covered products and reverse.

**I.**

In July 2019, the Council of the City of Berkeley, California, adopted Ordinance No. 7,672-N.S.—

"Prohibition of Natural Gas Infrastructure in New Buildings" ("Ordinance").   As its name implies, the Ordinance prohibits, with some exceptions, "Natural Gas Infrastructure" in "Newly Constructed Buildings" in the City of Berkeley.   Berkeley Mun. Code ("BMC") § 12.80.040(A).   "Natural Gas Infrastructure" is defined as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending from the point of delivery at the gas meter as specified in the California Mechanical Code and Plumbing Code."   *Id*. § 12.80.030(E).   And "Newly Constructed Building" refers to "a building that has never before been used or occupied for any purpose."   *Id*. § 12.80.030(F).   These building codes "apply to Use Permit or Zoning Certificate applications" submitted after the Ordinance's January 1, 2020, effective date.   *Id*. §§ 12.80.020(A), 12.80.080.

The Ordinance seeks to "eliminate obsolete natural gas infrastructure and associated greenhouse gas emissions in new buildings where all-electric infrastructure can be most practicably integrated, thereby reducing the environmental and health hazards produced by the consumption and transportation of natural gas."   *Id*. § 12.80.010(H).   By its own terms, the Ordinance "shall in no way be construed . . . as requiring the use or installation of any specific appliance or system as a condition of approval."   *Id*. § 12.80.020(C). The Ordinance also exempts a new construction from its prohibition if it is in the "public interest" or if it is "not physically feasible."   *Id*. §§ 12.80.040(A), 12.80.050.

In November 2019, the Association sued the City of Berkeley, claiming that EPCA and state law preempted the Ordinance.   After the City moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed

the EPCA claim.   It concluded that EPCA must be "interpreted in a limited manner," so that the Act doesn't "sweep into areas that are historically the province of state and local regulation." *Cal. Rest. Ass'n v. City of Berkeley*, 547 F. Supp. 3d 878, 891 (N.D. Cal. 2021).  Because the Ordinance does "not facially regulate or mandate any particular type of product or appliance" and because its impact is "*at best* indirect[]" on consumer products, the district court ruled that EPCA does not preempt the Ordinance.  *Id*.  It then declined to exercise supplemental jurisdiction and dismissed the state-law claims.  *Id*.

The Association timely appealed, and we review de novo.  *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th Cir. 2005).

## II.

Before jumping to the merits of this case, we must first assure ourselves of the Association's Article III standing.  To satisfy associational standing requirements, an organization must demonstrate that (1) at least one of its members has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, not merely speculative, that the injury will be redressed by a favorable decision.  *Nat. Res. Def. Council v. EPA*, 735 F.3d 873, 878 (9th Cir. 2013).  Berkeley contends that the Association lacks standing because it failed to establish that the Ordinance would imminently harm its members.   We disagree.

When "standing is challenged on the basis of the pleadings," we must "accept as true all material allegations

of the complaint" and "construe the complaint in favor of the complaining party." *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988) (simplified).   At this stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (simplified).

In its complaint, the Association explains that restaurants rely on natural gas for preparing certain foods and that many chefs are trained only on natural gas stoves.   The Association's members include restaurateurs and chefs who do business or seek to do business in Berkeley.   And the Association alleges that one or more of its members would like to open or relocate a restaurant in a new Berkeley building completed after the Ordinance became effective on January 1, 2020.   But those members could not do so because of the Ordinance's ban on natural gas.   The City contends these allegations don't establish standing because they don't allege "*how soon*" in the future an Association member would open or relocate a restaurant.

To establish "actual or imminent" injury, the Association must show a "credible threat that a probabilistic harm will materialize." *Id.* (simplified).   The goal of this requirement is "to ensure that the concept of 'actual or imminent' harm is not stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Id*. (simplified).   In *Natural Resources Defense Council*, we held that it was enough that the government's action "increases the threat of future harm to [the organization's] members." *Id*.   In that case, the imminence prong was satisfied when the Environmental Protection Agency's conditional registration of two pesticides would

"increase[] the odds of exposure" for the organization's members' children. *Id*.

Given our precedent, the Association has easily established standing. The Association has alleged that its members would open or relocate a restaurant in a new building in Berkeley but for the City's ban on natural gas. Thus, because of the Ordinance, the Association's members cannot open a restaurant in any new Berkeley building and use natural gas appliances. That poses a "credible threat" of a "probabilistic harm," even if the Association hasn't provided a date certain for any restaurant's opening night.

We now turn to the merits of this challenge.

### III.

At issue here is the scope of EPCA's preemption clause. Berkeley argues that EPCA preemption only covers regulations that impose standards on the design and manufacture of appliances, not regulations that impact the distribution and availability of energy sources like natural gas. The federal government, as amicus, offers a slightly different take. It contends that EPCA only preempts "energy conservation standards" that operate directly on the covered products themselves. The Association disagrees with both. It believes that EPCA preemption extends to regulations that effectively ban covered products from using available energy sources.

As with any express preemption case, our focus is on the plain meaning of EPCA. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016). That's because "the plain wording of the clause . . . necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* In discerning its meaning, we look to EPCA's text, structure,

and context.  *See R.J. Reynolds Tobacco Co. v. County of Los Angeles*, 29 F.4th 542, 552 (9th Cir. 2022).  And we apply this textual analysis "without any presumptive thumb on the scale" for or against preemption.  *Id.* at 553 n.6.

Based on its text, structure, and context, we conclude EPCA preempts Berkeley's Ordinance banning natural gas piping within new buildings.

## A.

EPCA's preemption clause establishes that, once a federal energy conservation standard becomes effective for a covered product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," unless the regulation meets one of several categories not relevant here.  42 U.S.C. § 6297(c).  For our purposes, we need to determine what constitutes a "regulation concerning the . . . energy use" of a covered product.

First, some definitions.  EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use."  § 6291(4).[1]  "[E]nergy" refers to "electricity" or "fossil fuels," such as natural gas.  § 6291(3).  A "consumer product" is "any article" which "consumes, or is designed to consume," energy or water and is distributed for personal use.  § 6291(1).  The preemption clause applies to any "covered product," which is defined as certain "consumer products," like refrigerators, dishwashers, and

---

[1] Unless otherwise indicated, all section (§) citations refer to Title 42 of the U.S. Code.

kitchen ovens.   §§ 6291(2), 6292.**[2]**   And as a matter of
ordinary meaning, "point of use" means the "place where
something is used."   Oxford English Dictionary Online
(2022).

So putting these terms together, EPCA preempts
regulations that relate to "the quantity of [natural gas]
directly consumed by" certain consumer appliances at the
place where those products are used.  Right off the bat, we
know that EPCA is concerned with the end-user's ability to
*use* installed covered products at their intended final
destinations. After all, a regulation that prohibits consumers
from using appliances necessarily impacts the "quantity of
energy directly consumed by [the appliances] at point of
use."  So, by its plain language, EPCA preempts Berkeley's
regulation here because it prohibits the installation of
necessary natural gas infrastructure on premises where
covered natural gas appliances are used.

Berkeley's main contention is that its Ordinance doesn't
regulate "energy use" because it bans natural gas rather than
prescribes an affirmative "quantity of energy."    While
Berkeley concedes that a prohibition on natural gas
infrastructure reduces the energy consumed by natural gas
appliances in new buildings to "zero," it argues that "zero"
is not a "quantity" and so the Ordinance is not an "energy
use" regulation.  But that defies the ordinary meaning of
"quantity."   In context, "quantity" means "a property or
attribute that can be expressed in numerical terms."  Oxford

---

[2] The preemption clause also applies to "industrial equipment," which
includes commercial equipment that may be used in restaurants. *See*
§§ 6311(1), 6316(a).

English Dictionary Online (2022).  And it is well accepted in ordinary usage that "zero" is a "quantity."[3]

Equally unavailing is Berkeley's argument that EPCA's definition of "energy efficiency" precludes a total prohibition on natural gas piping from being an "energy use" regulation.  EPCA defines "energy efficiency" as the "ratio of useful output of services . . . to the energy use" of the product.  § 6291(5).  According to Berkeley, "zero" cannot serve as the "quantity of energy" in "energy use;" otherwise, the "energy efficiency" ratio would have an impermissible "zero" denominator.  But in that case, both the denominator ("energy use") *and* the numerator ("output") would be zero—which simply yields an indeterminate result.[4]  And

---

[3] *See, e.g.*, *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1359 (Fed. Cir. 2020) (import data recorded "a quantity of zero"); *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010) (referring to "zero" as an "arbitrary quantity of time"); *see also* 85 Fed. Reg. 22,641 (discussing "a quantity of zero blocks" in an auction context).  Even children, bees, and crows apparently understand that "zero" is a numerical quantity.  *See* Bialystok E. & Codd J., *Representing quantity beyond whole numbers: some, none, and part*, 54 Can. J. Experimental Psych. 117–28 (2000) (showing children aged three to seven could work with "quantities" including "whole numbers" and "zeros"); *see also* Katie Spalding, *Crows Once Again Prove Their Intelligence By Showing That They Understand Zero*, IFL Science (June 17, 2021) (citing evidence that honeybees and crows can "understand zero as a numerical quantity—as 'something' rather than 'nothing.'").  Same goes for the scientific community.  *See, e.g.*, A.S. Kompaneyets, Theoretical Physics 377 (2d ed. 2013) ("[T]he shift of an energy level is equal to the average of the perturbation energy for unperturbed motion . . . .  But it is easy to see that the average of this quantity is equal to zero.").

[4] In math, an "indeterminate" expression is "unknown or variable," "not definitively or precisely determined."  *See* Eric Weisstein, *Indeterminate*, WOLFRAM MATHWORLD, https://perma.cc/2PD6-5ZZK.

we doubt that Congress meant to hide an exemption to the plain text of EPCA's preemption clause in a mathematical equation.

Thus, a regulation that imposes a total ban on natural gas is not exempt from EPCA just because it lowers the "quantity of energy" consumed to "zero." In other words, a regulation on "energy use" fairly encompasses an ordinance that effectively eliminates the "use" of an energy source. As the Court said long ago, a regulation may "assume the form of [a] prohibition." *Champion v. Ames*, 188 U.S. 321, 328 (1903).

And as a textual matter, EPCA preemption is not limited to facial regulations of consumer products as the district court held. Although the district court recognized EPCA's "broad" reach, it limited preemption to regulations that "directly regulate either the energy use or energy efficiency of covered appliances." *Cal. Rest. Ass'n*, 547 F. Supp. 3d at 891. It thus cabined preemption to regulations that "facially . . . mandate or require a[] particular energy use of a covered product." *Id.* Such a reading is divorced from the statute's text. It first ignores that "energy use" is based on consumption that happens "at point of use." § 6291(4). This means that we measure energy use not from where the products roll off the factory floor, but from where consumers *use* the products. Put simply, by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses. So EPCA preemption extends to regulations that address the products themselves *and* the on-site infrastructure for their *use* of natural gas.

To erase any doubt, rather than limit preemption to facial regulations of products, Congress expressly expanded

EPCA's reach to regulations that "concern[]" such products. § 6297(c). The Supreme Court has explained that "'[c]oncerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (simplified). In the legal context, this has "a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject." *Id.* at 1760. We thus read the term "expansively" and, as a matter of ordinary meaning, a regulation may "concern" something without directly regulating that thing. *Cf. Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 378–90 (1992) (holding that the Airline Deregulation Act, which prohibits States from enforcing any law "relating to rates, routes, or services" of any air carrier, preempted fare-advertising guidelines that "would have a significant impact upon" the airlines' ability to charge fares). At a minimum then, by using the term "concerning," Congress meant to expand preemption beyond direct or facial regulations of covered appliances. And a regulation that bans the delivery of natural gas to products that operate on natural gas "concerns" the energy use of those products.

And we know that EPCA preemption reaches building codes. Indeed, a whole subsection of EPCA's preemption provision is devoted to "building code requirements." § 6297(f). By its own terms, "a regulation . . . that is contained in *a State or local building code for new construction* concerning the energy efficiency or energy use of a covered product is not superseded" by EPCA until a certain effective date or if the code complies with seven requirements. § 6297(f)(1)–(3) (emphasis added). So subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of consumer

products. Otherwise, there would be no need to set an effective date or create a special carve-out for building codes, which do not fall into the category of direct regulations on products. Congress thus indicated that EPCA preempts building codes, like Berkeley's ordinance, that function as "energy use" regulations. Put differently, EPCA does not permit States and localities to dodge preemption by hiding "energy use" regulations in building codes.

EPCA's waiver provision likewise shows the extensive scope of the preemption clause. EPCA permits the federal government to waive preemption if a State shows that a proposed regulation is needed to meet "unusual and compelling State or local energy[] interests." § 6297(d)(1)(B)–(C). But it stops the federal government from waiving preemption if the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis." § 6297(d)(3). So the federal government must consider the complete lifecycle of an appliance—from manufacturing to servicing—in reviewing a waiver petition. Such a provision would make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product. A burden on "servicing," for example, may implicate regulation of the installation and use of the product—like Berkeley's building code. And no doubt Berkeley's ban, if adopted by States and localities throughout the country, would "significantly burden" the "sale" of covered products "on a national basis." *Id*.

**B.**

The Government offers slightly different textual arguments. It contends that EPCA only preempts "energy conservation standards" that operate directly on covered

products themselves.  To justify its position, the Government first latches onto EPCA's language stating that a state regulation concerning the energy use of a covered product is not "effective with respect to such product."  § 6297(c).  The Government contends that this language limits EPCA's preemptive scope to only direct regulations on covered products.**[5]**

But the Government's textual analysis is wrong.  The phrase the Government highlights simply limits EPCA's preemption to a regulation's *effect* on covered products—it doesn't say that the regulation must be *on* the covered products.  To illustrate, think of EPCA's preemption clause as a conditional sentence:  If a "regulation concern[s] . . . [the] energy use . . . of [a] covered product," then it is preempted "with respect to such product."  The latter clause doesn't modify the meaning of the former.

---

[5] We note that the Government's position hasn't always been that EPCA preempts only direct regulations on covered products.  When interpreting the 1978 version of EPCA, the Government concluded that the Act would preempt regulations of energy infrastructure, like building codes. The Government warned that "[s]tandards subject to preemption would include standards for any particular type (or class) of covered products established by *mandatory State or local building codes*."  47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982) (emphasis added).  Even more to the point, the Government advised that a "[p]rohibition of hook-ups for appliances with less than a certain efficiency would be subject to preemption."  *Id.*  So back in 1982, the Government acknowledged that EPCA would supersede building codes dealing with energy requirements for "hook-ups for appliances."  And the Government maintained this position when EPCA's preemption provision was narrower than today. *See* § 6297(a)(2) (1978) (superseding any state regulation that provides for "any energy efficiency standards or other requirement with respect to energy efficiency or energy use of a covered product").

To put it more concretely: Say a State enacts a broad
regulation on all appliances—some that are "covered" and
some that are not.   EPCA would only supersede the
regulation's impact on the covered products.  And the State
could still enforce its regulation against the non-covered
products.  In other words, if a building code concerns the
"energy use" of covered and non-covered products alike,
EPCA's preemptive effect is limited to the covered products.
Here, Berkeley may enforce its building code on non-
covered products, but EPCA displaces its effect on covered
products.[6]   But this language in no way narrows a
"regulation concerning the . . . energy use" to direct
regulations on covered products themselves.

The Government next argues that EPCA preemption
only acts on regulations that are the equivalent of "energy
conservation standards."  For this, the Government relies on
the title of EPCA's preemption provision.  Section 6297(c)
is entitled, "General rule of preemption for energy
conservation standards when Federal standard becomes
effective for product."    Based on this heading, the
Government contends that "regulation[s] concerning energy
efficiency [or] energy use" in EPCA's operative preemption
clause should be construed to mean only state regulations
that function as "energy conservation standards."  But there
are three problems with this argument.

First, § 6297(c)'s heading cannot supersede its plain text.
While the "title of a statute" may help clarify an ambiguous
word or phrase, it "cannot limit the plain meaning of the

---

[6] We thus disagree with the Association's assertion that EPCA preempts
the Ordinance "as a whole."  Rather, when it comes to the Ordinance's
effect on non-covered products, EPCA has no impact.

text." *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (simplified). The Government hasn't identified enough ambiguity in the preemption clause for the subsection's title to provide much interpretive guidance.

Second, Congress gave "energy use," "energy efficiency," and "energy conservation standards" related, but different, meanings. Recall that "energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use." § 6291(4). At the same time, EPCA defines "energy efficiency" as the "ratio of the useful output of services from a consumer product to the energy use of such product." § 6291(5). And finally, an "energy conservation standard" is generally "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use." § 6291(6)(A). So for EPCA purposes, these terms are closely related, but not identical.

And third, elsewhere EPCA uses both phrases *together*—which shows that they aren't simply interchangeable. For example, EPCA allows the federal government to waive preemption for a regulation "which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use." § 6297(d)(1)(A). If "energy use" means "energy conservation standards" as the Government argues, this provision would create redundancy in the statutory text. Rather, by placing them in a list like this, Congress intended the phrases to be related, but distinct, concepts.

EPCA's operative preemptive text is thus not limited to "energy conservation standards" as the Government would like us to hold. While EPCA's preemptive effect is triggered by federal enactment of an energy "performance standard"

on a covered product, the statute then broadly preempts any state regulation concerning "energy use" and "energy efficiency" of the covered product. §§ 6291(6)(A), 6297(c). At bottom, the Government argues that we should supplant "energy use" and "energy efficiency" and replace those terms with "energy conservation standards." But we presume that Congress means what it says, and we can't simply reconfigure the statute to fit the Government's needs. Indeed, after Congress has taken pains to define each phrase separately, it would be inappropriate for courts to disregard these nuances and treat the phrases as interchangeable.

## C.

We next address Berkeley's non-textual arguments.

Berkeley first argues that finding preemption here would impliedly repeal the Natural Gas Act, 15 U.S.C. § 717 et seq. We disagree. The Natural Gas Act "create[s] a comprehensive and effective regulatory scheme of dual state and federal authority" over the wholesale of natural gas. *S. Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1090 (9th Cir. 2010). It does so by granting the Federal Energy Regulatory Commission ("FERC") "exclusive jurisdiction" over three areas: the "transportation of natural gas in interstate commerce," the "sale in interstate commerce of natural gas for resale," and "natural-gas companies engaged in such transportation or sale." *Id*. (quoting 15 U.S.C. § 717(b)). But the Natural Gas Act "specifically exempted from" FERC regulation "the 'local distribution of natural gas.'" *Id*. (quoting 15 U.S.C. § 717(b)).

By its terms then, the Natural Gas Act only prevents FERC from regulating the local distribution of gas. So as a textual matter, the Natural Gas Act's restriction on FERC authority doesn't conflict with Congress, through EPCA,

deciding to supplant building codes that prevent the operation of natural gas appliances. Thus, there's nothing irreconcilable about the scope of EPCA's preemption provision and the Natural Gas Act. We see no implied repeal problem.

Berkeley finally contends that preemption here would mean that the City must affirmatively make natural gas available everywhere. That does not follow from our decision today. We only hold that EPCA prevents Berkeley from banning new-building owners from "extending" fuel gas piping within their buildings "from the point of delivery at the gas meter." *See* BMC § 12.80.030(E). Our holding doesn't touch on whether the City has any obligation to maintain or expand the availability of a utility's delivery of gas to meters.

## D.

Berkeley and the Government ask us to make interpretive moves similar to those that the Supreme Court rejected in *Engine Manufacturers Association v. South Coast Air Quality Management District*, 541 U.S. 246, 252 (2004). In that case, our court had interpreted the Clean Air Act, which prohibits States from enforcing any standard "relating to the control of emissions from new motor vehicles," as not preempting a local ordinance that prevented fleet operators from purchasing or leasing vehicles that did not comply with the local emissions standards. *Id.* at 252. In short, our court "engraft[ed]" a "limiting component" onto the statute which narrowed the Clean Air Act's preemptive reach to standards on manufacturers, rather than purchasers. *Id.* at 253. But the Supreme Court rejected our approach and emphasized that "[t]he manufacturer's right to

sell federally approved vehicles is meaningless in the absence of a purchaser's right to buy them." *Id.* at 255.

Other Supreme Court cases teach the same lesson. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 458 (2012) (holding that the Federal Meat Inspection Act, which prohibits States from imposing requirements "with respect to [livestock] premises, facilities and operations," preempted a California regulation that placed additional requirements on the *sale* of meat); *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 652 (2013) (criticizing State efforts to "avoid preemption by shifting their regulatory focus" to different companies within the same supply chain because it did not "make[] any difference" that the State chose "an indirect but wholly effective means" of achieving a preempted goal); *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 372 (2008) (finding state law that was "less direct than it might be" nevertheless preempted because it "produce[d] the very effect that the federal law sought to avoid").

As these cases make clear, States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly*. EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings. So Berkeley can't evade preemption by merely moving up one step in the energy chain and banning natural gas piping within those buildings. Otherwise, the ability to use covered products is "meaningless" if consumers can't access the natural gas available to them within the City of Berkeley. *See Engine Mfrs. Ass'n*, 541 U.S. at 255.

## IV.

In sum, Berkeley can't bypass preemption by banning natural gas piping within buildings rather than banning natural gas products themselves. EPCA thus preempts the Ordinance's effect on covered products.   We therefore reverse and remand for proceedings consistent with this opinion. On remand, the district court must reinstate the Association's state-law claims.

O'SCANNLAIN, Circuit Judge, concurring:

I agree that EPCA preempts the Ordinance.  But I only reach that conclusion because, under Ninth Circuit precedent, I believe I am bound to hold that the presumption against preemption does *not* apply to the express-preemption provision before us today.  That conclusion is not obvious or easy. In my view, this issue presents a challenging question in a deeply troubled area of law—namely, which of the apparently conflicting lines of cases we should follow in applying the presumption against preemption in express-preemption cases.

At first glance, one might have thought this issue was already resolved by our decision in *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005). There, like here, we were called upon to assess a set of express-preemption provisions in EPCA.  *Id.* at 495 (interpreting 42 U.S.C. §§ 6297(a), 6316(a)-(b)).   We followed Supreme Court precedent   and   applied   the   Supreme-Court-mandated "presumption against preemption" to interpret the EPCA preemption provisions "narrow[ly]." *Id.* at 496 (applying *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  Our

decision in *Air Conditioning* was no outlier. The Supreme Court consistently instructed us to apply the presumption in express-preemption cases, at least in areas of traditional state concern—and we consistently followed these instructions. *Sprint Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 578 (9th Cir. 2008) (en banc) (confirming *Air Conditioning*'s approach).

But things are, unfortunately, not so simple today. In its recent *Franklin* decision, the Supreme Court stated that "because the statute contains an express pre-emption clause, we do not invoke any presumption against preemption." *Puerto Rico v. Franklin California Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (cleaned up). The Court did not mention—much less expressly overrule—the decades of cases where the presumption had indeed been applied in like circumstances. And the Court did not, respectfully, provide much discussion of its decision not to apply the presumption. Instead, after the Court stated it would "not invoke" the presumption, it explained that it would "focus on the plain wording of the clause," which is "where the inquiry should end, for the statute's language is plain." *Id.* (cleaned up).

What to make of *Franklin*'s "drive-by ruling" is challenging. *Whitman v. United States*, 574 U.S. 1003 (2014) (Scalia, J., statement respecting denial of certiorari). We do not assume that the Court has overruled its older precedents "by implication." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). And we do not easily assume that the Court has abrogated our circuit precedents unless the decisions are "clearly irreconcilable," particularly where the Supreme Court decisions we relied on remain on the books. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Nevertheless, our circuit—without hesitating to consider *Franklin*'s limits or the possibility of reconciling *Franklin* with existing

precedent—has broadly read *Franklin* categorically to prohibit applying the presumption to express-preemption provisions in future cases. *See, e.g.*, *R.J. Reynolds Tobacco Co. v. Cnty. of Los Angeles*, 29 F.4th 542, 553 n.6 (9th Cir. 2022).    Under these post-*Franklin* decisions, *Air Conditioning* no longer seems to govern here—and the presumption does not apply.

Respectfully, I have my doubts.  As an inferior-court judge—bound to respect Supreme Court and Ninth Circuit precedent—I have great difficulty in deciding how to read the Supreme Court's instructions here. *See, e.g.*, *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018) (Wilkinson, J.) (noting the Supreme Court's "somewhat varying pronouncements on presumptions in express preemption cases").  And I am not alone—circuits are split on this issue.  *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 258 (5th Cir. 2019) (collecting circuit split).  While I ultimately conclude that, under this court's cases, the presumption does not apply here, the law remains troubling and confused—beset by tensions in Supreme Court precedents, disagreement among the circuits, and important practical questions still unanswered.  I write separately to indicate the need for further guidance.

I

A

The application of the presumption against preemption to express-preemption provisions has always raised hard questions.  But at least after the Supreme Court's decision in *Cipollone*, the rule was clear: the presumption applies even to express-preemption provisions, at least in areas of traditional state concern.  *See, e.g., Cipollone v. Liggett Grp.,*

*Inc.*, 505 U.S. 504, 518 (1992); *Medtronic,* 518 U.S. at 485. Under this framework, we were instructed to interpret express-preemption provisions "narrow[ly]" in light of "two presumptions about the nature of preemption." *Medtronic*, 518 U.S. at 485.  First, "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (cleaned up).  Second, "any understanding of the scope of a preemption statute must rest primarily on a fair understanding of congressional purpose," which is "primarily" discerned from statutory text but also informed by "the structure and purpose of the statute as a whole." *Id.* (cleaned up).

This approach, to be sure, invited criticism early on. *See, e.g., Cipollone*, 505 U.S. at 544–48 (Scalia, J., concurring and dissenting in part) (explaining that "our job is to interpret Congress's decrees of pre-emption neither narrowly nor broadly, but in accordance with their apparent meaning"); Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 291 n.205, 292–303 (2000) (arguing that "courts should not give artificially crabbed constructions to preemption clauses"). Despite these objections, the Supreme Court continued to apply the presumption to express-preemption provisions over the years. *See, e.g.*, *Cipollone*, 505 U.S. at 518; *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995); *Medtronic*, 518 U.S. at 485; *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997); *Bates v. Dow Agrosciences, LLC*, 544 U.S. 431, 449 (2005); *CTS Corp. v. Waldburger*, 573 U.S. 1, 18–19 (2014); *but see Mutual Pharm. Co. v. Bartlett*, 570 U.S. 472 (2013) (applying preemption but declining to mention the presumption against preemption).  And the inferior courts—duty-bound to follow

the Supreme Court—continued to apply the presumption as well. *See, e.g.*, *Air Conditioning*, 410 F.3d at 496; *see also, e.g.*, *Mass. Ass'n of Health Maint. Orgs. v. Ruthardt*, 194 F.3d 176, 179 (1st Cir. 1999) (same); *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 537 (5th Cir. 2006) (same).

B

Our circuit was no exception. In *Air Conditioning*—a case remarkably on point here, at first glance—we followed the *Cipollone*-era cases in deciding to interpret a set of EPCA express-preemption provisions "narrowly." 410 F.3d at 497, 501. We first restated the Supreme Court's approach. Our interpretation of the preemption provisions was "informed by two presumptions about the nature of preemption." *Id.* at 496 (citing *Medtronic*, 518 U.S. at 485). First was "the starting presumption that Congress did not intend to supplant state law," at least in an area involving the "'historic police powers of the States.'" *Id.* (quoting *Medtronic*, 518 U.S. at 485). Second was the principle that "'the purpose of Congress is the ultimate touchstone in every pre-emption case,'" as revealed "'not only in the text, but through [our] reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.'" *Id.* (quoting *Medtronic*, 518 U.S. at 485–86). We then dutifully applied this approach—concluding that a narrow reading of the text, along with a study of the legislative history, revealed that the preemption provisions were owed a "narrow" construction. *Id.* at 497, 501. Because the *Air Conditioning* decision faithfully applied Supreme Court precedent, we confirmed its legal standard in *Sprint Telephony*, 543 F.3d at 578 (en banc).

## II

Given this backdrop, one might have thought that the question whether the presumption against preemption applies here is an easy one, already resolved by our decision in *Air Conditioning*. Because a "narrow" reading is available, *see, e.g.*, City Br. at 8, one might have assumed that the presumption against preemption applies, and EPCA does not preempt the Ordinance. Such an assumption, though respectable, would be wrong—at least in the Ninth Circuit. As explained below, the law has grown more complicated and, might I say, confused since *Air Conditioning* was decided. The Supreme Court's instructions since *Air Conditioning* have not proved entirely consistent with its earlier decisions—and inferior courts remain divided over what to make of the Court's decision in *Franklin*, which did "not invoke" the presumption but still declined to overrule decisions where the presumption had been applied in like circumstances. *Franklin*, 579 U.S. at 125; *see Air Evac*, 910 F.3d at 762 n.1 (Wilkinson, J.). In our court, at least, we have taken a broad view of *Franklin*, and the presumption against preemption no longer seems to apply to express-preemption provisions. *See Reynolds*, 29 F.4th at 553 n.6. But I suggest the Supreme Court's instructions on this point are not so clear, and I would welcome guidance on whether we have followed those instructions correctly.

## A

The Supreme Court used to tell us that the presumption against preemption applies to express-preemption provisions in areas of traditional state concern. But then, in *Franklin*, the Supreme Court—tasked to decide whether the Bankruptcy Act preempted a Puerto Rico debt-collection

statute—stated that "because the statute contains an express pre-emption clause, we do not invoke any presumption against preemption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Franklin*, 579 U.S. at 125 (cleaned up).  The Court went on to conclude that the statute was preempted—explaining that "the plain text of the Bankruptcy Code begins and ends [the] analysis" because "the statute's language is plain." *Id.* (cleaned up).

In doing so, the Court, I suggest, left much room for confusion.  The *Franklin* Court did not acknowledge—and, most importantly, did not expressly overturn—the decades of decisions applying the presumption against preemption to express-preemption provisions.  And the *Franklin* Court did not resolve—nor even discuss—the scope of the rule it was applying.  Was the *Franklin* Court simply electing to "not invoke" the presumption in a case easily answered by the "plain" statutory text?  Perhaps *Franklin*'s rule prohibits the application of the presumption to *all* express-preemption provisions.  But perhaps *Franklin*'s rule also depends on other considerations—such as whether the statute operates in an area of traditional state concern, *see Bates, LLC*, 544 U.S. at 449, or whether the preemption provision is truly in equipoise, *see Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018); *Bates*, 544 U.S. at 432 (explaining that even if another "plausible alternative" reading were available, "this Court would have a duty to accept the reading disfavoring pre-emption").  Perhaps the Court is moving away from applying preemption with an eye to the legislative intent and purpose that were so important during the *Cipollone* era, and toward an approach centered on the plain text enacted by Congress.  *Compare, e.g.*, *Franklin*, 579 U.S. at 125 (beginning and ending the analysis

with "plain text"), *with Medtronic*, 518 U.S. at 485, 490–91 (examining the "basic purpose of the legislation as well as its history"). With respect, *Franklin* leaves much unanswered—and I wonder if its "drive-by ruling," which appears to "contradict[] the many cases before," *Whitman*, 574 U.S. at 1003 (Scalia, J., statement respecting denial of certiorari), really goes so far as to abrogate the decades of case law applying the presumption to express-preemption provisions in so many different statutes.

B

Our court has adopted a broad understanding of the precedential sweep of *Franklin*'s passing statement. In several post-*Franklin* decisions, we have explained, without any apparent reservation, that when "'the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'" *Int'l Bhd. of Teamsters, Loc. 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 853 (9th Cir. 2021) (quoting *Franklin*, 579 U.S. at 125) (cleaned up); *see also Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1153 n.1 (9th Cir. 2022) (same); *Reynolds*, 29 F.4th at 553 n.6 (same); *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021) (same); *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (same). Our circuit has also declined to apply the presumption even beyond *Franklin*'s immediate context—including in areas of traditional state concern, *see Int'l Bhd. of Teamsters*, 986 F.3d at 853, and cases involving statutory ambiguity, *see Reynolds*, 29 F.4th at 553 n.6. Perhaps that is a plausible reading of the Supreme Court's instructions, when all the Court's cases are read together. But I have my reservations,

and I regret that, with due respect for my colleagues, we have not meaningfully grappled with the issue.

1

First, I am not convinced that we have correctly followed the Supreme Court's instructions in this admittedly troubled area. The Supreme Court is always free, of course, to change its precedent. But our court does not enjoy such power. As explained, while *Franklin* declined to invoke the presumption, it also declined expressly to mention—much less to overrule—the many cases where the Court had repeatedly applied the presumption. I do not read *Franklin*'s passing remark as *sub silentio* overruling the decades of Supreme Court cases that held—indeed, mandated—that the presumption applies. And I have real doubts about whether *Franklin* abrogated Ninth Circuit precedents that rested on pre-*Franklin* Supreme Court decisions. Perhaps *Franklin*'s rule could be read modestly and reconciled with some of those decisions. *See Shuker*, 885 F.3d at 771 n.9 (giving *Franklin* a narrow reading). And perhaps *Franklin* could be understood to leave intact circuit precedents that were based on Supreme Court decisions that *Franklin* declined directly to disturb. *See, e.g.*, *Air Conditioning*, 410 F.3d at 495 (relying on *Medtronic*, 518 U.S. at 485); *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 647 (9th Cir. 2008) (relying on *Travelers*, 514 U.S. at 661); *cf. Dialysis*, 938 F.3d at 259 n. 11 (concluding that *Franklin* did not abrogate circuit precedent predicated on *Travelers*). In the face of so much law from the Court requiring the application of the presumption over the years, I would not rush to read *Franklin* as categorically establishing that the presumption is inapplicable to express-preemption provisions across the board.

2

Second, whatever the extent of *Franklin*'s reach, I am concerned that our court has not adequately grappled with this difficult question.  I regret that essentially none of our decisions relying on *Franklin* to jettison our pre-*Franklin* approach offered any express discussion of the *Miller* or *Agostini* doctrines—ordinarily a requirement for us to act in the teeth of old precedent.  *See, e.g.*, *Miller*, 335 F.3d at 900 (holding that a prior circuit authority is only abrogated where it is "clearly irreconcilable" with the "reasoning or theory of intervening higher authority"); *Agostini*, 521 U.S. at 237 (holding that "lower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions").    Our cases that have addressed *Franklin*'s scope and effect have said, with all due respect, very little—and, with due respect again, nothing that directly addresses the inquiries *Miller* and *Agostini* require us to conduct.  *See Nat'l R.R. Passenger Corp.*, 41 F.4th at 1153 n.1; *Reynolds*, 29 F.4th at 553 n.6; *Teamsters, Loc. 2785*, 986 F.3d at 853; *Atay*, 842 F.3d at 699; *Connell*, 988 F.3d 1097.  Perhaps our court has correctly interpreted the Supreme Court's instructions, but the lack of any meaningful engagement with the question does not inspire confidence.

3

But I do not write on a blank slate.  Even though *Air Conditioning* applied the presumption to an express-preemption provision in EPCA, I understand the Ninth Circuit precedent since *Franklin* to instruct that the broad reading of *Franklin* is now our court's law—meaning that at least where, as here, we are tasked to interpret the preemptive scope of a new express-preemption provision, the presumption against preemption is inapplicable.  *See,*

*e.g.*, *Reynolds*, 29 F.4th at 553 n.6; *supra* at 31 (collecting cases establishing this rule).   Under this approach, even if *Air Conditioning* continues to govern the specific preemption provisions it was tasked to construe (42 U.S.C. §§ 6297(a), 6316(a)-(b)), it should not be extended to the neighboring-but-distinct express-preemption provision we are required to interpret today (42 U.S.C. § 6297(c))—and so the presumption does not apply here.   Perhaps that is a puzzling and unsatisfying result.   But it is the one that Ninth Circuit precedent seems to require.

C

One final note.   I am not alone in my confusion over how to interpret the Supreme Court's instructions.   As others have observed, the Supreme Court's "somewhat varying pronouncements on presumptions in express preemption cases" have caused divisions in the circuits, in what Judge Wilkinson has described as "the great preemption wars." *Air Evac*, 910 F.3d at 762 n.1 (collecting varying Supreme Court instructions); *see also Dialysis*, 938 F.3d at 258 (collecting circuit split).

There is much confusion over how broadly to read *Franklin*'s passing remark—and what to do with the many cases, unmentioned by *Franklin*, where the presumption had applied.   Some circuits (including ours) have read *Franklin* broadly to prohibit applying the presumption to express-preemption provisions in future cases.   *See Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016); *Dialysis Newco, Inc. v. Cmty. Health Sys. Grp. Health Plan*, 938 F.3d 246, 259 (5th Cir. 2019); *Watson v. Air Methods Corp.*, 870 F.3d 812, 817 (8th Cir. 2017); *EagleMed LLC v. Cox*, 868 F.3d 893, 903 (10th Cir. 2017).   Other courts, however, are not so sure—and the Third Circuit, at least, has read *Franklin* to

permit applying the presumption where an express-preemption provision implicates an area of traditional state concern. *See Shuker*, 885 F.3d at 771 n.9; *cf. Air Conditioning*, 410 F.3d at 496 n.1.

As inferior-court judges, we ultimately must address the important question about whether *Franklin* has spoken with sufficient clarity to abrogate existing Supreme Court and circuit precedent—or whether *Franklin* can be reconciled with at least some of those cases. *See, e.g.*, *Miller*, 335 F.3d at 900 (abrogation of circuit precedent); *Agostini*, 521 U.S. at 237 (abrogation of Supreme Court precedent); *Khan v. State Oil Co.*, 93 F.3d 1358, 1363 (7th Cir. 1996) (Posner, J.). While some circuits have given that issue careful attention, *Dialysis*, 938 F.3d at 259 n.11 (declining to "extend" a pre-*Franklin* circuit decision that rested on *Travelers*, but also declining to "abrogate[]" it), the question of *Franklin*'s abrogating reach remains unsettled—with significant implications for the vast and important areas of law where Congress has sought to extend federal supremacy.

                    *          *          *

We are duty-bound to apply binding precedents of the Supreme Court and the Ninth Circuit. Alas, those precedents "are not always clear, consistent, or coherent." *Separation of Church & State Comm. v. City of Eugene of Lane Cnty., State of Or.*, 93 F.3d 617, 627 (9th Cir. 1996) (O'Scannlain, J., concurring). Here, I believe I am bound by our post-*Franklin* precedents to hold that the presumption is inapplicable to the express-preemption provision before us today. And for that reason, I join the panel's opinion. But I remain concerned that this area of law is troubling and confused, with tensions in the Supreme Court's precedents, splits in the circuits, and important practical questions

unanswered. Greater clarity and further guidance from the Court on how to navigate preemption doctrine after *Franklin* would be most welcome.

---

BAKER, Judge, concurring:

I write separately to express my reservations about the California Restaurant Association's standing and to explain my understanding of why the City of Berkeley's Ordinance No. 7,672-N.S. ("Ordinance") invades the core area preempted by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6297(c).

I

To have associational standing, an organization must establish that:

> (a) its members would otherwise have standing to sue in their own right;
>
> (b) the interests it seeks to protect are germane to the organization's purpose; and
>
> (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) ("*AGC*"). The second and third elements of this test are not in dispute here.

As to the first element, an organization must establish that "a member suffers an injury-in-fact that is traceable to

Case 4:19-cv-07668-YGR   Document 84   Filed 04/17/23   Page 37 of 46

CALIFORNIA RESTAURANT ASS'N V. CITY OF BERKELEY        37

the defendant and likely to be redressed by a favorable decision." *Id*. (citing *Braunstein v. Ariz. Dep't of Transp.*, 683 F.3d 1177, 1184 (9th Cir. 2012)). To do so, the organization must make "specific allegations establishing that at least one *identified member* had suffered or would suffer harm." *Id*. (emphasis by the *AGC* court and quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). This "requirement of naming the affected members has never been dispensed with in light of statistical probabilities." *Id*. (quoting *Summers*, 555 U.S. at 498–99).[1] Thus, when an organizational plaintiff asserting associational standing failed at summary judgment to "identify any affected members by name" or "submit[ ] declarations by any of its members attesting to harm they have suffered or will suffer" from the challenged policy, we held that the organization could not rely on "the general allegations in its complaint asserting that its members would suffer harm" and dismissed the appeal for lack of standing. *AGC*, 713 F.3d at 1194–95.[2]

Here, the standing allegations in the California Restaurant Association's complaint identify no individual member injured by the challenged Berkeley Ordinance:

---

[1] The only exception to this rule is "where *all* the members of the organization are affected by the challenged activity." *Summers*, 555 U.S. at 499 (emphasis in original).

[2] In *Summers*, the organizational plaintiff failed to identify any injured members at trial. *See* 555 U.S. at 500 (holding that supplementation of the district court record to receive affidavits from the organization's members was not permitted "in the circumstances here: *after the trial is over, judgment has been entered, and a notice of appeal has been filed*") (emphasis in original).

> The CRA's members include both restaurant owners and chefs. It has members that do business in Berkeley, California, or who seek to do business in Berkeley, whose interests will be directly affected by this Ordinance. The CRA has one or more members who are interested in opening a new restaurant or in relocating a restaurant to a new building in Berkeley after January 1, 2020, but who cannot do so because of the Ordinance's ban on natural gas. One or more members would seek to open or relocate a restaurant in a new building in Berkeley but for the ban on natural gas. . . .

Under *Summers* and our decision in *AGC*, the Association's failure to identify any specific member injured by the Ordinance could be fatal to its standing. *See Summers*, 555 U.S. at 499 ("In part because of the difficulty of verifying the facts upon which such probabilistic standing depends, the Court has *required* plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm . . . .") (emphasis added).[3]

But *AGC* is not our last word on *Summers*. More recently, in *National Council of La Raza v. Cegavske*—as

---

[3] Relying on circuit precedent, *Natural Resources Defense Council v. EPA*, 735 F.3d 873 (9th Cir. 2013), the panel correctly holds that the Association's allegations sufficiently allege a "credible threat" of a "probabilistic harm" for standing purposes at the pleading stage. Opinion at 10. In that case, which came to us on a petition for review of agency action, the organizational petitioner identified some of its injured members by attaching their declarations to its brief. *See, e.g.*, No. 12-70268, Dkt. No. 18-3.

here, on appeal from dismissal at the pleading stage—we rejected the argument "that *Summers*, an environmental case brought under the National Environmental Policy Act, stands for the proposition that an injured member of an organization must always be specifically identified in order to establish Article III standing for the organization." 800 F.3d 1032, 1041 (9th Cir. 2015). Instead, we stated that an organization asserting associational standing need not identify an injured member "[w]here it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected by a defendant's action, and where the defendant need not know the identity of a particular member to understand and respond to an organization's claim of injury." *Id*.

I think it is "relatively clear" that at least one of the Association's members will be harmed by the challenged Ordinance, and the City doesn't need to know the identity of that member to understand and respond to the Association's complaint at the pleading stage. Thus, under *Cegavske*— which is in tension with *Summers* and our decision in *AGC*— the Association's failure to identify in its complaint any member injured by the Ordinance does not defeat its standing.

And quite apart from what we said in *Cegavske*, it's unclear whether the requirement that an organizational plaintiff specifically identify injured members even applies at the pleading stage. As standing is an "indispensable part of the plaintiff's case," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992), it "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id*.

At the pleading stage, an organizational plaintiff need only assert "general factual allegations of injury [to its members] resulting from the defendant's conduct . . ., for on a motion to dismiss *[a court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim*." *Id*. (cleaned up and emphasis added). Here, because we presume that they are true, the complaint's general factual allegations of injury to the Association's members arguably suffice even though those allegations identify no injured member.**[4]** *But see Draper v. Healey*, 827 F.3d 1, 3 (1st Cir. 2016) (Souter, J.) (advocacy group lacked associational standing at the pleading stage because its "complaint did not identify any member of the group whom the regulation prevented from selling or purchasing a Glock").

Unlike at the pleading stage, however, at summary judgment "mere allegations" of injury are not enough, and an organizational plaintiff "must set forth by affidavit or other evidence specific facts" substantiating the factual allegations of injury to its members. *Lujan*, 504 U.S. at 561 (cleaned up). "And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial." *Id*. (cleaned up). Thus, under *Summers* and

---

[4] *AGC* appears to imply as much. *See* 713 F.3d at 1195 (distinguishing *Northeastern Fla. Chptr. of Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 668–69 (2013), because it involved a verified complaint's general allegations of injury to an organization's members that "*had to [be] "accept[ed] . . . as true*" at summary judgment because they were unchallenged, whereas *AGC* involved an unverified complaint's general allegations of injury disputed at summary judgment) (emphasis added). Here, even though the Association's general allegations of injury are disputed, we must accept them as true because we are at the pleading stage.

our decision in *AGC*, at summary judgment or trial an organizational plaintiff is undoubtedly obligated to identify one or more of its injured members—among other "specific facts" detailing the nature of their asserted injury—even if *Lujan* dispenses with that requirement at the pleading stage.

## II

Justice Scalia famously noted—in context of the Employee Retirement Income Security Act of 1974 (ERISA)'s express preemption clause,[5] which employs broad "related to" language materially similar to EPCA's,[6] *see Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1759 (2018) (equating " '[c]oncerning' with 'relating to' "); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (defining "related to" as, among others, "to have bearing or concern") (quoting *Black's Law Dictionary* 1158 (5th ed. 1979))—that "applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring). Thus, the breadth of EPCA's preemption provision, like ERISA's, "does not mean the sky is the limit." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013). For that reason, EPCA preemption is

---

[5] ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title." 29 U.S.C. § 1144(a).

[6] EPCA's preemption clause provides that after a federal energy conservation standard applies to a covered product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product." 42 U.S.C. § 6297(c).

unlikely to reach a host of state and local regulations that incidentally impact "the quantity of [natural gas] directly consumed by a [covered] product at point of use." 42 U.S.C. § 6291(4).

For example, nothing in EPCA's text or structure suggests any concern with state and local taxes that might reduce consumption of natural gas. Thus, at least as far as EPCA is concerned, states and local governments are likely free to impose carbon taxes designed to discourage such consumption. Nor is there any indication from its text or structure that EPCA speaks to the distribution of natural gas. If a state or local government terminates existing gas utility service or declines to extend such service, EPCA likely has no application.[7]

But the challenged Ordinance does not implicate a utility's distribution of natural gas. Instead, like EPCA, it assumes that gas service is otherwise available at premises with products covered by the federal statute. *See* BMC § 12.80.030(E) (defining prohibited "natural gas infrastructure" as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending *from the point of*

---

[7] For the same reason, EPCA's preemption provision—which also encompasses state and local regulations "concerning the . . . [electricity] use" and "water use" of "covered product[s]," 42 U.S.C. § 6297(c)—almost certainly does not affect state or local measures to ration or curtail the distribution of water due to droughts or electricity due to wildfire risk or grid limitations. *See* Brief of *Amici Curiae* Energy and Environmental Law Professors in Support of Defendant-Appellee City of Berkely (*Amici* Law Professors), at 14, 17 (describing state and local authority to limit electricity and water distribution for various public purposes). As I read it, EPCA assumes that energy service or water is otherwise available to the premises at which a covered product is used.

*delivery at the gas meter* as specified in the California Mechanical Code and Plumbing Code") (emphasis added).

The Pacific Gas & Electric Company (PG&E)—the utility serving Berkeley—explains in a document cited by the *Amici* Law Professors that "the service delivery point for the gas supply is the point where PG&E's facilities connect to the applicant's house pipe (i.e., houseline)." Pacific Gas & Elec. Co., *Electric & Gas Service Requirements (TD-7001M) 2022–2023*, at 2-50 (2022) ("*PG&E Manual*").[8] The following diagram "illustrates a typical service delivery point," *id.*:



**Figure 2-1**
**Typical Gas Service Installation**

---

[8] https://www.pge.com/pge_global/common/pdfs/services/building-and -renovation/greenbook-manual-online/greenbook_manual_full.pdf.

*Id.* at 2-6. And to zero in even further, as shown in the side view of a typical meter below, the service delivery point is just after the meter:



Side View

*Id*. at 2-51; *see also id*. at 2-49 ("The [customer's] houseline at the service delivery point typically is located after the PG&E service tee for residential services.").

PG&E further explains that it "is responsible for maintaining the system that delivers natural gas, up to and including the gas meter." Pacific Gas & Elec. Co., *Natural Gas Customers: Important gas safety information regarding your pipelines* at 1 (2021).**[9]** PG&E's customers, on the other hand, are

> responsible for maintaining the [customer]-
> installed and owned gas service piping,
> valves, automatic shut-off devices (e.g.,

---

[9] https://www.pge.com/pge_global/common/pdfs/your-account/your-bill/understand-your-bill/bill-inserts/2021/0821-New-Gas-Customer.pdf.

> earthquake valves), or other piping
> components on any premises or in any
> building. These [customer]-owned
> components must be installed downstream of
> (i.e., after) the gas supply service delivery
> point.

*PG&E Manual* at 2-49. In short, the customer-owned piping
constitutes everything downstream of the service tee fitting
on the utility's gas meter.

The Berkeley Ordinance—*a building code*—prohibits
the customer-owned piping that receives gas distributed by
the utility at the meter, and scrupulously avoids touching on
infrastructure owned by the utility, including the meter or the
service pipe connecting the meter to the gas distribution
main. And although EPCA has little, if anything, to say
about a state or local government's regulation of a utility's
distribution of natural gas to customers, it has everything to
say about "State or local building code[s] for new
construction concerning the . . . energy use of . . . covered
product[s] . . . ." 42 U.S.C. § 6297(f)(3). "[R]egulation[s] or
other requirement[s]" in such codes *are* preempted unless
they "compl[y] with all of" various specified conditions. *See
id*. § 6297(f)(3)(A)–(G). And it's undisputed the Ordinance
does not do so.

Thus, far from having only "a tenuous, remote, or
peripheral connection," *N.Y. State Conf. of Blue Cross &
Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 661
(1995), to the subject matter preempted by EPCA, the
Berkeley Ordinance cuts to the heart of what Congress
sought to prevent—state and local manipulation of building
codes for new construction to regulate the natural gas
consumption of covered products when gas service is

otherwise available to premises where such products are used. And as the panel explains, because EPCA would unquestionably preempt a building code that prohibited the attachment of covered appliances to the owner's piping that receives gas at the utility's service delivery point, it necessarily also preempts a building code that instead bans that piping to evade preemption. I therefore join the panel opinion in full.